# CHARLESTON.

### WOLFORD v. BIAS *et als.*

## Submitted November 14, 1916.   Decided November 28, 1916.

1. PRINCIPAL AND SURETY—*Cosureties—Lien.*

    Where two persons purchase land, with a secret understanding that each shall pay an equal portion of the purchase price, and execute their joint notes therefor to the vendor, and take a conveyance to themselves jointly, or for a life estate to one and the remainder in fee to the other, they are sureties for each other to the extent of one-half the joint obligation, and an equitable lien exists in favor of the one, who pays more than his portion of the debt, upon the share or estate of the other, to secure the excess. (p. 350).

2. VENDOR AND PURCHASER—*Bona Fide Purchaser—Rights of.*

    Where the vendor retains a lien to secure the purchase money, in such case, and has been paid the purchase price in full by one of the joint obligors, a *bona fide* purchaser of the interest or estate of the one who has failed to pay his proportion of the purchase price, being informed by the vendor, before purchasing, that the lien was satisfied though not formally released on the record, who takes a conveyance for such interest, or estate, from such joint purchaser, without notice of the latent equity in favor of the other joint purchaser, thereby acquires the superior right.   (p. 350).

3. SAME—*Bona Fide Purchaser—Notice.*

    Having been informed by the holder of the lien that it had been discharged, such purchaser had a right to assume that it had been paid by the persons whose primary duty it was to pay it, and owed no duty to such joint purchasers to inquire of them concerning latent equities between them, the record not disclosing any. (p. 354).

4. SAME—*Liens—Validity.*

 A lien will not be kept alive to protect a latent equity in favor of one occupying the relation of surety, if the rights of a subsequent *bona fide* purchaser have intervened. (p. 354).

 (MILLER, JUDGE, dissenting).

Appeal from Circuit Court, Mingo County.

Suit by Sylvina Wolford against B. R. Bias, trustee and others. From a decree for defendants, complainant appeals.

*Affirmed.*

*Goodykoontz & Scherr* and *J. H. Clevenger,* for appellant.
*Wade H. Bronson,* for appellees.

WILLIAMS, PRESIDENT:

Sylvina Wolford and John Wolford, her husband, purchased from Emily D. Ireson, W. J. Ireson, her husband, uniting in the conveyance, a house and lot in the town of Williamson, at the price of $1,500, $500 of which was paid in cash by Mrs. Wolford out of her own estate, and she and her husband executed to Mrs. Ireson their four joint promissory notes for $250 each, payable in six, twelve, eighteen and twenty-four months from the 25th of September, 1908, with interest, with the alleged understanding between the obligors that the husband would pay them. He paid no part of them, and the wife paid them out of her own earnings. The vendors granted the property to Sylvina Wolford for life, with remainder in fee to her husband. A vendor's lien was retained to secure the notes, and it has not been formally released.

John Wolford was a drunkard and did little toward earning a living. They have lived together, in Williamson, since 1907, or 1908, and sometimes had serious disagreements. Following one of his drunken sprees on the 30th of April, 1913, the record discloses that John Wolford decided to sell his interest in the property and leave his wife. He did sell and convey it to one Henry Harrison, the deed reciting a consideration of $1,250. The consideration actually paid was $750, $500 of which was cash, and for the balance Harrison executed his note and delivered it to Wolford. B. R. Bias and G. R. C. Wiles, partners, furnished Harrison the money

with which to make the cash payment, with the agreement that all three of them were to be equal joint owners of said Wolford's interest. The deed was executed to Harrison. Later, on the same day, and at his request, Wiles and Bias furnished Harrison with $200 to discount and take up his note to Wolford, and Harrison swears he paid the money to Wolford and received from him his note and destroyed it. Shortly thereafter Wiles and Bias purchased Harrison's interest, paying him $300 therefor, and he then conveyed the whole of John Wolford's estate in remainder to B. R. Bias, trustee for himself and G. R. C. Wiles.

Learning of these conveyances Mrs. Wolford brought this suit in equity against her husband, Mrs. Ireson and W. J. Ireson, her husband, Henry Harrison, B. R. Bias, trustee, and said Bias and G. R. C. Wiles, partners, charging that she had paid the full purchase price to Mrs. Ireson for the land, with the understanding with her husband that she was to be the sole grantee in fee, but that her husband had procured the deed to be written in its present form; that she objected to it, and he told her, if she did not accept it in that form, he would leave her, whereupon she accepted it; that she has added to the property, out of her own means, valuable permanent improvements, costing in all about $521; that her husband was a confirmed drunkard and gambler and Henry Harrison was a gambler and the proprietor of gambling places; that he made her husband beastly drunk for the purpose of inducing him to convey his property to him, and, when he was too drunk to know what he was doing, induced him to convey it to him in consideration of a small sum, not to exceed $300; that about April 30, 1913, her husband left, and has permanently abandoned her, without cause and she is ignorant of his whereabouts; that she is informed and believes that said Bias, as trustee, holds the property in trust for the law firm of Wiles and Bias, to secure their fees for legal services to be rendered to said Harrison in any litigation relative to the property. In her bill she expressly exonerates Wiles and Bias of any knowledge of Harrison's alleged fraudulent design. She prays for a decree against her husband for one-half of the purchase price of the land, with

interest from the date of the purchase, and for the whole of
the value of the improvements she had put upon the house,
that she be subrogated to rights of the vendor, Mrs. Ireson,
in the unreleased lien, and for general relief. She does not
ask to have any of the above mentioned deeds set aside as
being fraudulent. Wiles and Bias answered, admitting they
furnished the necessary money to buy John Wolford's in-
terest, with the understanding with Harrison, that all three
of them were to be equal joint owners; that later they
bought Harrison's interest, paying him $300 for it; that both
the deed from John Wolford to Harrison, and the deed from
the latter to B. R. Bias, trustee, recite, as the consideration,
larger sums of money than were actually paid. They deny
that John Wolford was drunk when he executed the deed to
Harrison, or that said Bias holds the title to secure fees con-
tracted to be paid to them by Harrison. They do not admit
the charge of fraud against said Harrison in purchasing Wol-
ford's interest, and deny any knowledge of it, if there was
any fraud, and deny, specially, all other material allega-
tions. They aver that they purchased the property in good
faith and paid $1,000 therefor. No other defendant an-
swered. On the pleadings, general replication having been
made to the aforesaid answer, and depositions filed on behalf
of both the plaintiff and defendants Wiles and Bias, the court
dismissed plaintiff's bill, and she has appealed.

The denial of her alleged right to have the unreleased ven-
dor's lien enforced for her benefit, to the extent of $750, that
being her husband's alleged share of the purchase money paid
by her, and refusal to decree a sale of his interest to satisfy
the same, is assigned by plaintiff as error.

The joint purchase money notes had been paid before John
Wolford sold his interest, but the lien retained to secure them
had not been formally released on the record. It is urged by
counsel for plaintiff, that she occupied the relation of surety
for her husband on their joint notes, to the extent of the por-
tion thereof which he should have paid, and having paid it
for him, equity subrogates her to the lien of the vendor,
against the share, or estate of her husband. This, as a gen-
eral proposition, is the correct rule in case of a joint pur-

chase by tenants in common, and no authorities need be cited to sustain it. Nor do we think the principle would be different where, as in this case, one takes a life estate and the other a remainder, provided the purchase is joint and the obligation for the purchase price is also joint. The principle rests on the ground of suretyship, existing between joint obligors who, as between themselves, are primarily liable to · pay a certain portion only of the joint debt, and is applied for the protection of the one who discharges more than his ratable share of the burden. The necessity resting upon either grantee of several estates to pay the whole consideration, where it is secured by a joint obligation, in order to protect his particular estate, is just as imperative as in the case of a tenant in common to protect his undivided interest. But this general rule has its exceptions, and the vital question here presented is, are Wiles and Bias *bona fide* purchasers of John Wolford's estate, without notice of his wife's equity, and if so, is her claim to subrogation superior to their right. There is no proof that Wiles or Bias, or even Harrison, knew of the alleged agreement between plaintiff and her husband respecting the amount each should pay on the joint notes. The record does not disclose what part each was primarily bound to pay, or that it was not the primary duty of the plaintiff to pay all the purchase money. The unreleased vendor's lien, was constructive notice to the purchasers, that the debt was not paid, but Bias inquired of the vendors' and ascertained that the debt had been paid. He and Wiles are therefore innocent purchasers for value, without notice of plaintiff's latent equity. Their position is equally as secure as if the lien had been formally released on the record. The formal release provided by statute, if it had been made and recorded, would have furnished them no more information than they obtained directly from the lienor. Having learned from the vendor that the debt was paid, they were not required to make inquiry of the purchasers, to ascertain if any secret equities existed between them, before they could safely buy. They could assume the debt had been paid by the party, or parties, whose primary duty it was to pay it.

"Where the record shows that a prior mortgage has been

satisfied, without showing by whom payment was made, a purchaser having no other notice than the record may assume that payment was made by the party owing the primary duty to make it; and if the record only discloses that if a certain person paid the mortgage debt he is entitled to subrogation, the purchaser examining the title need not look beyond the record to ascertain whether or not the payment was in fact made by that person." *Ahern* v. *Freeman,* 46 Minn. 156, 24 Am. St. Rep. 206. The supreme court of Massachusetts holds, in *Rand* v. *Cutler,* 155 Mass. 451, that a junior mortgagee, who took a mortgage upon the faith of what the record disclosed, is protected, and that the right of subrogation can not be invoked to the injury of an innocent third person. This court held, in *Hawker* v. *Moore,* 40 W. Va. 49, that the surety's right of subrogation could not prevail, "to the injury of any one who, by any rule of strict law, or in equity and good conscience, stands on higher ground, or for any reason has a better right. Such an one will not be displaced or his right disturbed. This is the essence of the doctrine of subrogation."

Although equity will generally keep a lien alive, even after it has been formally released on the record, for the protection of a surety, it will not do so, if the equity of the surety is latent, and the rights of a subsequent *bona fide* purchaser have intervened. *Richards* v. *Griffith,* 92 Cal. 493, 27 Am. St. Rep. 156, is directly in point. There Bunnell executed his note for $700 to Charles St. Sure payable on November 11, 1886, and a mortgage on certain lands to secure the same. Griffith & Stose recovered a judgment against Bunnell for $303.26, on August 25, 1886. On October 21, 1886, Bunnell executed to plaintiff his note for $1,200, payable two years after date, and also executed and delivered to him a mortgage on the same property, previously mortgaged to St. Sure, and orally agreed with Bunnell that the St. Sure mortgage should be discharged out of the $1,200 loaned. Plaintiff immediately paid St. Sure the amount due him and St. Sure canceled the mortgage. An execution was issued on the Griffith & Stose judgment, and at the sheriff's sale of the mortgaged property, they became the purchasers at the price of $315.60,

and, no· redemption having been made within the required time, the sheriff executed and delivered to Griffith & Stose a deed for the property. · The St. Sure mortgage was recorded August 3, 1885, and the mortgage to plaintiff on October 21, 1886. Under the foregoing state of facts plaintiff contended that, by virtue of his agreement with Bunnell and the payment of the St. Sure mortgage in pursuance thereof, he was entitled to be subrogated to the rights of St. Sure in his mortgage, which antedated the judgment, to satisfy which the land was sold, and that equity should keep alive the mortgage, for his benefit, even though it had been formally released. Griffith & Stose had no notice of the agreement between plaintiff and Bunnell respecting the payment of the St. Sure mortgage out of the money plaintiff loaned Bunnell. The court held that Griffith & Stose were innocent purchasers for value and their rights were superior to plaintiff's latent equity. The rule almost universally announced by the courts is, that one having a mere latent equity will not be subrogated to the rights of a creditor, if to do so prejudices the rights of an innocent purchaser for value, without notice of such equity. In addition to the cases cited, the following cases lay down the same principle. *Persons* v. *Shaeffer,* 65 Cal. 79; *Amick* v. *Woodworth et al.,* 58 Ohio St. 86, a case very much in point; and *Rice* v. *Winters,* 45 Neb. 517. Copious notes by Mr. Freeman on the doctrine of subrogation will be found at pages 476-533, 99 Am. St. Rep., appended to the case of *American Bonding Co.* v. *National &c. Bank,* decided by the supreme court of Maryland. At page 480, dealing with the subject of intervening rights and equities, Mr. Freeman says: ''Since subrogation is a creature of equity, it must be· enforced with a due regard to the rights, legal or equitable, of others. It cannot be invoked so as to work injustice, or defeat a legal right, or overthrow a superior or perhaps even an equal equity, or displace an intervening right or title.''

Counsel for appellant cite and rely on *Tompkins* v. *Mitchell,* 2 Rand. 428, decided by the supreme court of appeals of Virginia. That case does not control in the decision of this case for two reasons: (1) it was decided before the recording act was passed, when it was not necessary for the vendor

to expressly reserve a lien in his deed of conveyance to secure payment of the purchase money; and (2) because it appears, from reading the opinion, that the trustee to whom the insolvent joint purchaser had assigned his interests in the land, did have actual knowledge of the fact that his grantor had not paid his portion of the purchase money. The trustee was, therefore, a purchaser with notice of the equity in favor of the other joint purchaser. The decree is affirmed.

*Affirmed.*

MILLER, JUDGE, *(dissenting):*

In my opinion the decree should be reversed, and plaintiff given the relief, by subrogation, prayed for. She and her husband were joint purchasers and joint makers of the note given for the deferred payment of purchase money. Her interest according to the deed was that of life tenant, his remainderman, the greater estate, each was bound on the note as principal for his or her share of the purchase money, and as surety for the share of the other, with right of subrogation to the lien of the vendor, on the respective moities in the land. This the opinion of the court concedes,citing some of the authorities. See, also, the following: *Dobyns* v. *Rawley,* 76 Va. 537; *Tompkins* v. *Mitchell,* 2 Rand. 428; *Horton* v. *Bond,* 28 Grat. 815, 825; *Grove* v. *Grove,* 100 Va. 556, 42 S. E. 312.

And it has been held in Virginia, by a decision binding us, and by this court, that this right of subrogation as between such joint purchasers is paramount to the rights of the widow for dower. *Wheatley* v. *Calhoun,* 12 Leigh 264; *Blair* v. *Mounts,* 41 W. Va. 706, 715, 24 S. E. 620, 623.

It has also been decided in Virginia and by this court, that where a purchaser pursuant to contract discharges a prior lien on the land, and the vendor becomes unable to execute the contract, the purchaser is entitled to the benefits of such lien, *although he took no assignment* thereof when he paid it, and that the lien will be kept alive in equity for his indemnity. *James* v. *Burbridge,* 33 W. Va. 272; *Hoke* v. *Jones, Id.* 501; *Moore* v. *Ligon,* 22 W. Va. 292; *McNeil* v. *Miller,* 29 W. Va. 480; *Gatewood* v. *Gatewood,* 75 Va. 407.

And the decisions say that the rights of a surety are su-

perior to those of a purchaser without notice. Hogg's Eq. Principles, 355, citing *Peirce* v. *Higgins,* 101 Ind. 178, *Downey* v. *Washburn,* 79 Ind. 242, *Leake* v. *Ferguson,* 2 Grat. 419, *Burbank* v. *Slinkard,* 53 Ind. 493, *McClung* v. *Beirne,* 10 Leigh 394, *Cottrel's Appeal,* 23 Penn. 294, *Edmunds* v. *Venable,* 1 P. & H. 121, Freeman on Judgments, section 470, and Sheldon on Subrogation, section 106.

And Mr. Freeman says: ''Whether the fact of payment is or is not apparent from the record, has no influence on the rights of the parties.''

The cases cited in the opinion of the court to support the theory of a secret or latent equity, not available against a purchaser without notice, are all cases where the liens were released of record, relieving innocent purchasers without notice. In the case at bar the lien was not released, but stood unreleased on the record, giving warning to every one dealing with reference to the property. Latent or secret equity has been defined as ''an equitable claim or right, the knowledge of which has been confined to the parties for and against whom it exists, or which has been concealed from one or several persons interested in the subject-matter.'' Black's Law Dictionary, 433.

But an unreleased lien to secure a joint note for purchase money is notice to the world of the rights of the parties to the deed or contract. A long line of decisions in Virginia and in this state say that what is sufficient to put a person upon inquiry will charge him with knowledge of the facts of which a diligent pursuit of that inquiry would have afforded him, and that when a party has the means of knowledge or discovery in his power he will be deemed to know all that with ordinary care and diligence he might have obtained knowledge of. 10 Ency. Dig. Va. & W. Va. 486, and cases cited. I think *Tompkins* v. *Mitchell, supra,* supports my views of this case. I think the purchasers in this case stopped short of their duty. Seeing the unreleased lien they should have inquired not only of the vendor but of the plaintiff also. If they had done so they would have learned the facts, and saved the plaintiff and her improvident husband the loss they must sustain by affirmation of the decree.