# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA.

### Wytheville.

### AMERICAN SURETY COMPANY V. QUINCEY.

#### June 12, 1919.

1. EXECUTORS AND ADMINISTRATORS—*Ex Parte Account—Surcharging and Falsifying—Burden of Proof—Reference.*—Conceding that an *ex parte* account of an executor, in the absence of exceptions, stood confirmed at the expiration of thirty days from the filing thereof, under section 2698, Code of 1904, the lower court was entirely right in referring the cause to a commissioner, where, before the decree of reference was entered, proof had been taken showing that the executor had misappropriated the funds, and that the settlement itself was based in the main upon fictitious and fraudulent entries. It is true that the burden is on the complainant in a suit to surcharge and falsify a due and regular *ex parte* account to show cause for reopening the same before a decree of reference can be properly entered. But in this case the requirements of this rule of practice were abundantly met.

2. EXECUTORS AND ADMINISTRATORS—*Foreign Executor—Liability of Surety.*—In a suit to surchage and falsify the account of a foreign executor and to require his surety to pay such sums of money as might be found due by him, the defense was set up that the greater part of the funds received by the executor were derived from the sale of real estate, and that the executor was not given power by the will to sell real estate or to collect rents and profits therefrom, and that as to such funds the surety was not liable, because its undertaking did not embrace them. The evidence disclosed that the surety before it executed the bond knew that the estate in Virginia consisted of de-

1

cedent's interest in an estate which had been in litigation in which decree had been issued appointing commissioners for the sale of real estate and the distribution of the proceeds thereof. It further appeared that the surety had an arrangement with the executor by which the amounts coming into his hands as such would be held under what is known as a joint control, and that the violation by the executor of this private agreement in handling proceeds of real estate induced the surety to seek and obtain its release and to require the executor to give a new bond.

*Held:* That whether the funds from the real estate in which decedent had an interest should be regarded as realty or personalty, they were funds which all parties concerned knew the executor would receive, and his bondsmen were therefore liable for a proper accounting in regard thereto.

3. SURETYSHIP—*Liability of Surety—Intention of Parties.*—It is very true that the liability of a surety is always *strictissimi juris* and cannot be extended by construction. It is not to be extended by implication beyond the terms of his contract. But, whatever that contract is, the surety is bound by it. Its terms can no more be restricted by implication than extended. The same rule, too, applies as in the case of any other contract with respect to the admissibility or non-admissibility of extraneous testimony of intention of the parties.

4. EXECUTORS AND ADMINISTRATORS—*Liability of Surety—Funds Fraudulently Paid by Executor to Himself as Executor in Another State.*—The surety on the bond of an executor is liable where the executor makes a fictitious and fraudulent transfer of funds properly turned over to him as executor in Virginia to himself as executor in New York. The funds having come regularly and lawfully into the hands of the executor in the Virginia jurisdiction, they could not be properly transferred to a non-resident representative without the approval of the local court. This is true as a general principal of law; and it is true in the instant case for the additional reason that under the provisions of section 492-b of the Code of 1904, the funds in the hands of the executor in Virginia could not be paid out or distributed until the taxes thereon had been paid.

Appeal from a decree of the Chancery Court of city of Richmond. Decree for complainants. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Wellford & Taylor,* for the appellant.

*David Meade White, Samuel A. Anderson* and *John The-all,* for the appellees.

KELLY, J., delivered the opinion of the court.

Florence B. Quincey, a resident of New York, died June 1, 1909, leaving a will made a few days prior thereto, which contained the following provisions pertinent to this controversy:

"Second. I will, devise and bequeath in trust for my beloved son, Chas. E. Quincey, Jr., as hereinafter set out, all the remainder of my property—real, personal and mixed—of whatever kind, and wherever situated, and for the purpose of carrying out this clause of my will, I direct that my executor hereinafter named shall make as speedy a settlement of my estate as is practicable, and that, upon the settlement of my estate, he transfer and turn over to the trustees hereinafter named for the use and benefit of my beloved son, Charles E. Quincey, Jr., as hereinafter set out, all the remainder of my estate in kind, including moneys, other personal property, real and mixed property, and, for this purpose, I invest my said executor with full power to sign, acknowledge and deliver all instruments necessary to the passing of the legal title in all said property to the said trustee, and I impose upon my said executor the duty thus to sign, acknowledge and deliver all said instruments.

"Third. I hereby nominate and appoint the Rev. Parker Morgan, who resides at the date of the execution of this will at or near the corner of Forty-fifth street and Fifth

avenue, in New York city, trustee under this will for my said son, Chas. E. Quincey, Jr., and I now prescribe the following rules and directions to govern the trust hereby and herein created, in addition to such rules and requirements as may be imposed by statute in such cases. The said trustee shall receive from my executor, hereinafter named, at the time of the settlement of my estate all the residue of my said estate of whatever kind and wherever situated, and he shall hold the same in trust for the use and benefit of my said son, Chas. E. Quincey, Jr., and he shall manage and control the same for his use and benefit. * * *

"Fourth. I hereby nominate and appoint Willis Bruce Dowd, whose address at the date of the execution of this will is 141 Broadway, New York city, N. Y., to be the executor of this my last will and testament, clothing him with all the powers and imposing upon him all the duties set out in this will and testament and all those prescribed by law and statute."

The original will was probated in New York June 29, 1909, and a duly authenticated copy thereof was admitted to probate in the Chancery Court of the city of Richmond, July 14, 1909. Willis B. Dowd, the executor therein named, qualified as such in New York on June 29, 1909, and in Virginia on May 18, 1910.

No bond was required of or given by the executor in New York, but when he qualified in Virginia he executed a bond in the penalty of $40,000 with the American Surety Company, of New York, as his surety. Some months later, on October 24, 1910, on the motion of the American Surety Company, the Chancery Court of the city of Richmond entered an order requiring the executor to give a new bond in a like penalty, and at the same time, on the motion of the surety company, directed him to file within thirty days from the date of that order, with the commissioner of ac-

counts, a full report of his transactions as executor in the State of Virginia.

The new bond was given on December 22, 1910, with the National Surety Company as surety, and on December 27, 1910, the executor filed with the commissioner of accounts a statement purporting to cover his transactions as executor in Virginia. The commissioner declined to allow some of the disbursements claimed by the executor and, nearly two years later, returned to the clerk's office a statement showing money received and paid out by the executor in his capacity as such in this State. The receipts and disbursements shown in this statement balanced each other, but a disbursement of $9,759.40 purported to be a payment from Dowd as executor in Virginia to himself as executor in New York, and this is the principal occasion and subject of this controversy. The report of the commissioner of accounts remained in the clerk's office for more than thirty days without any exceptions thereto, but it was never formally confirmed or recorded. The judge of the chancery court makes the following comment thereon: "The report on its face showed that the property was assessed for taxes for 1911 and 1912 and these taxes were not paid, and in my judgment the account showed error to this extent upon the face of it, and could not be confirmed. With the taxes unpaid, no amount could be properly disbursed. Sec. 492-b, Pollard's Code 1904."

This suit was brought by Chas. E. Quincey, Jr., and his father, Chas. E. Quincey (the latter being the husband of the testatrix and interested as tenant by the curtesy in certain of the property passing by the will) to surcharge and falsify the *ex parte* settlement of the executor's account; to require the sureties to pay such sums of money as might be found to be due by each of them by reason of the failure of the executor to faithfully discharge the duties of his

office; to have the estate administered and settled by the court, and for general relief.

The cause was referred to John B. Minor, a commissioner in chancery, to state and settle the Virginia accounts of Dowd as executor. In an elaborate and ably prepared report, in which Commissioner Minor dealt with all the questions of law and fact in the case, he rejected the credit of $9,759.40, disallowed commissions, and reported that the executor was indebted to the estate in Virginia in a total sum of $10,966.72, as of December 24, 1911, of which $8,-224.48 was chargeable to the American Surety Company, and $2,742.24 to the National Surety Company. The National Surety Company settled its liability by paying $2,000, which was agreed to on behalf of the Quinceys and accepted in full. The American Surety Company, however, resisted the liability and filed numerous exceptions to the report of the commissioner. These exceptions were overruled, and a decree was entered confirming the report and directing payment by the American Surety Company of the sum above indicated as its liability on its bond. From that decree this appeal was allowed.

A demurrer to the amended bill, upon which the cause was heard, was overruled, and this action on the part of the trial court is assigned as error. The ruling complained of was plainly right, and, except in so far as the demurrer raised questions arising on the final hearing and hereinafter disposed of, does not call for any discussion.

The next assignment of error goes to the merits of the case, and, stated generally, is a denial of the complainants' right to a decree against the American Surety Company for the amount reported against it by the commissioner and approved by the court.

[1] The first proposition advanced in support of this assignment is that the evidence was not sufficient to surcharge and falsify the *ex parte* account, and that, therefore, there

should have been no reference to a commissioner, but, instead, a decree dismissing the bill.

Conceding without discussion that the *ex parte* account was such as to fall within the provisions of section 2698 of the Code, and that, therefore, in the absence of exceptions, it stood confirmed at the expiration of thirty days from the filing thereof, the lower court was entirely right in referring the cause to a commissioner. It is quite true, as contended, that the burden is on the complainant in a suit to surcharge and falsify a due and regular *ex parte* account to show good cause for reopening the same before a decree of reference can be properly entered. *Wyllie* v. *Venable,* 4 Munf. (18 Va.) 369; 2 Bart. Chancery Practice, 682; *Robinett* v. *Robinett,* 92 Va. 124, 22 S. E. 856. But in this case the requirements of this rule of practice were abundantly met. Before the decree of reference was entered, proof had been taken showing that the executor had misappropriated the funds for which he had taken credit in his Virginia accounts, and that the settlement itself was based in the main upon fictitious and fraudulent entries. Without going into the several items of the account, or reciting with any particularity the evidence in regard thereto, it is sufficient to say that the account in question was, as stated in the decree of reference, surcharged and falsified, and that the settlement, therefore, became valueless as evidence. *Leake* v. *Leake,* 75 Va. 792, 803; *Owens* v. *Owens,* 109 Va. 432, 434, 63 S. E. 990.

There were eleven exceptions to the report of Commissioner Minor by the American Surety Company. These exceptions may be reduced to two fundamental contentions or defenses—first, that the greater part of the funds received by Dowd as Virginia executor were derived from the sale of real estate, that the executor was not given power by the will to sell real estate or collect rents and profits therefrom, and that as to such funds the surety is not liable because its undertaking did not embrace them; and, second, that even if

these funds were lawfully paid to Dowd as executor in Virginia, he had settled all debts and expenses of the estate in that jurisdiction and paid over the residue of the funds to himself as New York executor, thereby fully and faithfully discharging his official duty in this State. We will discuss these two contentions in their order.

[2, 3]   1. The condition of the bond executed by the American Surety Company was that Willis B. Dowd, as executor of the last will and testament of Florence Belle Quincey, deceased, should faithfully discharge the duties of his office. Such duties of course embraced a proper accounting for funds coming into his hands under the provisions of the will.

The record leaves no room to doubt that Mrs. Quincey expected her executor in the first instance, and her trustee afterwards, to handle her interest in what is known as the Ford estate in Richmond. Her interest in the latter was originally real estate. At the time of her death several suits, which we shall designate as the Ford suits, were pending for a determination of the interests of all the parties in the Ford estate. Commissioner Minor, in his report of facts, says:

"Prior to the institution of said suits, A. J. Ford, as trustee, had, from the profits of said real estate, accumulated and added to the trust estate quite a large amount of personal estate.

"The chief purpose of said suits seems to have been to secure an interpretation of said deed of trust, ascertain the interests of the beneficiaries thereunder, and to obtain partition of the real estate and the distribution of the proceeds of the trust estate (real and personal) amongst those entitled thereto.

"From the decree entered in said causes on April 26, 1910 (Exhibit E. A., Jr., No. 2), it appears that partial distri-

bution had theretofore been made among the beneficiaries of the money and proceeds of sale of personalty, and that in said previous distributions Florence Belle Quincey had received $25,149.40, less than her one-fourth share of the amount theretofore distributed, and that she was therefore entitled to have this amount paid to her out of the net proceeds of the trust estate (personalty and real) before the other beneficiaries, who had received more than their proportions, were to further participate therein. Schedule "A," attached to said decree, contains a list of the personal and real estate belonging to said trust estate then remaining unsold.

"From the testimony of Edgar Allan, Jr., pages 50-51, it appears that all of the money which had been distributed prior to April 26, 1910, was derived from income, and not from sale of real estate.

"While this decree was not entered until ten months after the death of Mrs. Quincey, her interest in the Ford estate was apparently the same at the date of her death as it was when said decree was entered."

Shortly after the qualification of the executor and the execution of the bond, decrees were entered in the Ford suits directing the payment to him in Virginia of sums amounting to $13,209.02; and it is quite clear that the American Surety Company understood that a large amount of money from this source would pass through the hands of the executor. The facts disclosed by the evidence fully warranted the learned judge of the lower court in the following statement appearing in his written opinion filed in this cause: "Even the American Surety Company, before it executed the bond as surety for Willis B. Dowd as Virginia executor, knew the condition of the Ford litigation; it knew that the Ford property had been ordered sold in this partition suit; it knew that the purpose of the qualifi-

2

cation of Willis B. Dowd as executor in Virginia was to make disbursements of the proceeds of sale of the real estate."

Prior to the execution of the bond, the Virginia agent for the surety company wrote to the New York manager thereof in regard to the bond, and made in connection therewith the following statement: "The estate in Virginia consists of decedent's interest in the Ford estate which has been in litigation for a number of years and in which decrees have recently been issued appointing special commissioners for sale of real estate and the distribution of the proceeds thereof." It further appears that the American Surety Company had a private arrangement with the executor by which the amounts coming into his hands, as such, would be held under what is known as a joint control, and that the violation by the executor of this private agreement in handling proceeds of real estate was the controlling reason which induced the surety company to seek and obtain its release and require Dowd to give a new bond.

Upon a comprehensive review of the evidence, Commissioner Minor reported to the court that the entire sum of $13,209.02, coming into the hands of the executor in Virginia under orders entered in the Ford suits, was properly payable to him as such executor, and that his bondsmen were, therefore, liable for a proper accounting in regard thereto. We have no difficulty in affirming as entirely correct the commissioner's finding of fact and of law in this regard. Whether the funds from the Ford estate be regarded as realty or personalty, they were funds which all parties concerned knew the executor would receive. The contract of the surety company comes clearly within the rule of law which is well stated as follows in the case of *Mann* v. *Mann, Guardian,* 119 Va. 634, 89 S. E. 898: "It is very true that the liability of a surety is 'always *strictissimi juris* and cannot be extended by construction.' It 'is not to be extended by implication beyond the terms of his contract.'

But, whatever that contract is, the surety is bound by it. Its terms can no more be restricted by implication than extended. The same rule, too, applies as in the case of any other contract with respect to the admissibility or non-admissibility of extraneous testimony of intention of the parties."

[4]   2. It is equally clear that the fictitious and fraudulent transfer—for it is plainly not to be otherwise regarded or described—of funds from Dowd as Virginia executor to Down as New York executor, had no force or virtue as a satisfaction of the obligation of the bond. This result would seem to follow inevitably and unanswerably from our previous conclusion that the funds in question had been properly turned over in the first instance to the executor in Virginia. Having come regularly and lawfully into the hands of the executor in the Virginia jurisdiction, they could not be properly transferred to a non-resident representative without the approval of the local court. This is true as a general principle of law; and it is true in this case for the additional reason that under the provisions of section 492-b of the Code, the funds in the hands of the executor in Virginia could not be paid out or distributed until the taxes thereon had been paid.

Discussion of this branch of the case has been carried to considerable length by counsel, and the opposing contentions have been ably presented. The conclusion which we have announced is, as we think, supported by the great weight of authority, and we are content to rest it upon the following citations: *Moses, et al.*, v. *Hart's Adm'r*, 25 Gratt. (66 Va.) 795; *Aspden* v. *Nixon*, 4 How. (U. S.) 467, 11 L. Ed. 1059, 1073; *Byers* v. *McAuley*, 149 U. S. 608, 13 Sup. Ct. 906, 37 L. Ed. 867; Minor's Conflict of Laws 255: Schouler on Wills and Administration, p. 395, sec. 174; 18 Cyc. 1247: 11 R. C. L., p. 411, 412.

We find no error in the decree complained of, and it is affirmed.

*Affirmed.*