# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### Richmond.

AMERICAN SURETY COMPANY OF NEW YORK, A COR-
PORATION, V. DAVID MEADE WHITE, EDGAR ALLAN,
JR., AND SAVINGS BANK OF RICHMOND.

March 19, 1925.

Argued before Judge Kelly took his seat.

1. RES ADJUDICATA—*Judgment for Beneficiary in Suit against Surety on
   Executor's Bond—Action by Surety against Participants in Executor's
   Devastavit—Case at Bar.*—The beneficiaries in a will brought suit
   against the executor and his surety for *devastavit*. The decree was
   for complainants and fixed the surety's liability. In that suit the
   surety asked that the defendants in the instant suit be made parties
   as participants in the alleged *devastavit*, which the court declined to
   do. The instant case was a suit by the surety against the defendants
   for moneys paid defendants by the executor before he qualified in.
   Virginia.
   *Held:* That the action of the court in the former suit denying the
   motion of the surety to make defendants parties to that suit did not
   bar surety in the instant case. That defendants be made parties to
   that suit was not essential to the disposition of the question as to
   the liability of the executor and his surety to the beneficiaries for
   the *devastavit*.

2. PARTIES—*Introduction of New Parties—Appeal and Error—Discretion of
   Court.*—The question of the introduction of new parties is a matter
   addressed to the sound discretion of the court, and its action will.
   not be interfered with, unless the discretion has been abused.

3. RES ADJUDICATA—*Refusal of Lower Court to make Defendants Parties—
   Action of Appellate Court in Sustaining Decree—Case at Bar.*—That

the appellate court sustained the action of the chancellor in a suit by the beneficiaries under a will against the executor and his surety, in refusing to make defendants parties to that suit on motion of the surety, is not conclusive of the question that the court in so doing was disposing of the question as to alleged liability of the defendants for their participation in the *devastavit*. As a matter of fact the action of the chancellor in this respect was not adverted to in the opinion of the appellate court.

4. RES ADJUDICATA—*General Rule.*—It is elementary that in the case of successive suits, where the parties are the same, the issue is the same, and that issue has been decided on its merits by a court of competent jurisdiction, the judgment in the first suit is *res judicata*, and cannot be called in question in any subsequent suit between the same parties, or their privies.

5. RES ADJUDICATA—*Question of Parties—Case at Bar.*—Where the merits of the instant case were not involved nor passed upon either by the trial court or Supreme Court of Appeals in a former suit, and the only question affecting defendants in that suit was the propriety of making them defendants, the decree in the former suit is not a bar to the present suit.

6. SUBROGATION—*Regard for the Rights of Others—Defeating a Legal Right.*— While it is true that subrogation is a creature of equity, and essential justice is its object, it must be enforced with a due regard to the rights, legal or equitable, of others. It cannot be invoked so as to work injustice or defeat a legal right.

7. LACHES—*Purely Equitable Right.*—Where the right sought to be enforced is a purely equitable one (that is, one not recognized at law), and there is no express statutory bar, and no analogy to be followed because claims of the character asserted are unknown to the law courts, then equity applies its own peculiar rule of laches.

8. LACHES—*Definition.*—"Laches" is the neglect to do something which a party ought to do.

9. LACHES—*Suit by Surety of an Executor against Alleged Participants in Devastavit—Suit Barred by Laches—Case at Bar.*—The instant case was a suit by a surety on an executor's bond who had been compelled to pay for the *devastavit* of the executor against defendants alleged participators with the executor in the *devastavit*. The surety's claim was purely equitable, having paid, as surety, the amount of three notes it asked to be subrogated to rights of the beneficiaries against the defendants as alleged participators in the *devastavit* of the executor. There was no allegation or proof of fraud on the part of defendants. By reason of surety's denial and litigation of its liability fourteen years' interest had accumulated on the principal sum paid on the notes. In the meantime the executor had died and defendants had lost their recourse against him.

*Held:* That the surety's suit was barred by laches.

10. EXECUTORS AND ADMINISTRATORS—*Suit against Surety of Executor on his Bond for Devastavit—Election by Surety to Pay Debt and be Subrogated to the Rights of the Beneficiary, or to Resist the Claim at the Risk of being Met with the Doctrine of Laches.*—When a surety on an Executor's bond is sued on his or its bond to recover for a *devastavit* committed by the principal, and expects to hold liable any one who was a participant in the *devastavit* (without being guilty of fraud), then the surety is bound to elect whether he will pay the debt and be subrogated to the rights of the beneficiary, or will resist the claim of the beneficiary and take his chance, in the event he has to pay, of being met with the doctrine of laches, or the statute of limitations in a proper case. In other words, the surety will not be permitted to "blow hot" when resisting the claim against the principal and himself (or itself), and then be permitted to "blow cold" when he is met by the plea of the statute of limitations, or the doctrine of laches interposed by one wholly innocent of any fraud, and absolutely not guilty of concerting with the principal to commit a *devastavit.*

11. LACHES—*Every Case Governed by its own Circumstances.*—Where there is a question of laches every case is governed chiefly by its own circumstances; sometimes the analogy of the statute of limitations is applied; sometimes a longer period than that prescribed by the statute is required; in some cases a shorter time is sufficient; and sometimes the rule is applied where there is no statutable bar. It is competent for the court to apply the inherent principles of its own system of jurisprudence, and to decide accordingly.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Wellford & Taylor, Meredith & Meredith,* and *Collins Denny, Jr.,* for the appellant.

*A. W. Patterson, S. A. Anderson,* and *David Meade White,* for the appellees.

CAMPBELL, J., delivered the opinion of the court.

This suit is a sequel to the chancery cause of *Ameri-*

*can Surety Company of New York* v. *Quincey*, reported in 125 Va. 1, 99 S. E. 641.

The facts disclosed by the record are these:

Florence Belle Quincey, who was a resident of New York City, was the daughter of A. J. Ford and Mary Lucy Ford, of the city of Richmond. As one of the children of A. J. Ford, she was, under the provisions of a trust instrument executed by him, entitled to a large share of the Ford trust property, which was the subject of litigation in the Chancery Court of the city of Richmond.

The appellees, David Meade White and Edgar Allan, Jr., represented Mrs. Quincey as her attorneys in the suit involving her interest in the Ford trust property.

In June, 1909, Mrs. Quincey departed this life at Tate Spring, Tennessee, leaving a last will and testament. In this will, Willis Bruce Dowd, of New York City, was named as executor. On June 29, 1909, the will of Mrs. Quincey was admitted to probate in New York and Dowd qualified as executor thereof, and became the duly authorized representative of the estate of the deceased, in New York.

As personal representative he did not execute any bond, as none was required by the laws of New York, unless requested by the beneficiaries under the will, who made no such request.

On July 14, 1909, an exemplified copy of the will was presented to the Chancery Court of the city of Richmond and was admitted to probate, but there was no qualification of the executor in Virginia until May 18, 1910, when Willis Bruce Dowd duly qualified as such executor, executing bond in the penalty of $40,000.00 with the appellant as surety. After the death of Mrs. Quincey, David Meade White and Edgar Allan, Jr.,

at the instance of the executor, continued to represent the Quincey interest in the Ford estate in Virginia, which comprised the major portion of the property left by Mrs. Quincey. In December, 1909, the Ford trust estate was still in a chaotic condition, and the interest to which the executor was entitled was unavailable. In this situation Dowd, the executor of the Quincey will, wrote to his attorneys, White and Allan, stating that the Quincey estate was in a very unsatisfactory financial condition, and that something must be done to meet the obligations which were pressing in several directions, and asked if some arrangement could not be made whereby he could have the use of $2,500.00 for the benefit and protection of the estate, until something could be realized therefrom. White and Allan made inquiries and ascertained that the Planters National Bank of Richmond would make the loan and so advised the executor.

Thereupon, Dowd made a note as executor of the Quincey will, which he endorsed, and which was endorsed also by White and Allan. This was done on December 15, 1909, and the proceeds of the note, amounting to $2,475.00, was that day mailed to Dowd in New York.

The executor made a second request in March, 1910, of the attorneys, White and Allan, that they borrow the sum of $500.00, and in May, 1910, he made a third request that they borrow an additional $500.00, stating each time that the money was needed for the estate. The money was obtained from the Savings Bank of Richmond on notes endorsed by the executor and White and Allan. The proceeds of these notes were sent to Dowd, by checks of David Meade White, on the same day the notes were discounted.

As heretofore stated, Dowd qualified in Virginia as

executor of the estate of Florence Belle Quincey on the 18th day of May, 1910. On June 11, 1910, a portion of the Ford trust estate was distributed by order of the chancery court, and the clerk thereof was directed to draw a check upon the fund, which was under the control of the court, in favor of Willis Bruce Dowd, executor of the estate of Florence B. Quincey, or David Meade White, his attorney, for the sum of seven thousand eight hundred and forty-two dollars and sixty-three cents. This check was made payable to White as attorney for the Quincey estate, and at the direction of Dowd, executor, White paid to himself and Allan $2,000.00, due to them for services rendered as attorneys in the litigation over the Ford trust estate.

White, pursuant to the further directions of Dowd, executor, paid the Planters National Bank of Richmond the sum of $2,500.00, this being the amount due the bank on the note discounted by it in December, 1909. The balance of this check of $7,842.63 White deposited in the Savings Bank of Richmond to the credit of Willis Bruce Dowd, as executor. When the notes held by the Savings Bank of Richmond became due, each was paid by charging them against Dowd's account with the bank.

Upon the qualification of Dowd as executor in Virginia, he entered into what is known as a joint control agreement with the appellant. The gist of this agreement is set forth in an alleged letter to the Savings Bank of Richmond, as follows:

"GENTLEMEN:

"Please take notice that the American Surety Company of New York has become surety upon my bond as executor of estate of Florence Belle Quincey in connection with which is involved the responsibility of the proper distribution of all funds or moneys deposited,

or hereafter deposited, by me with you to the account of said estate and that all checks, or drafts, or other legal written orders drawn by me as such executor against said funds or accounts, must be honored only when the approval thereof by the American Surety Company of New York is thereon written by Geo. N. Skipwith, agent, or by such other person as may hereafter be duly designated in writing by said company.

"This notice shall remain in force until revoked by me with the written assent of the said American Surety Company of New York, or until I am discharged as such executor.

"(Sgd.)    WILLIS BRUCE DOWD, Exr."

During the period from the date of Dowd's qualification as executor to October, 1910, full confidence and trust were reposed in him. He was a member of the New York bar in good standing. He had been appointed executor by the testatrix, and had qualified without the requirement of a bond in New York. Under the terms of the will he had been empowered with absolute authority to settle the decedent's estate, which was a valuable one, wherever situated. In October, however, the appellant, having discovered that Dowd was not carrying out his private agreement with appellant that the funds of the executor were to be held under the joint control of the executor and appellant, after due notice, applied to the court to require Dowd to give a new bond and surety. This Dowd did in December, 1910, and the National Surety Company became surety in the place and stead of the appellant.

Upon motion of appellant, Dowd was ordered by the court to settle his executorial account, and on December 27, 1910, filed with the commissioner of accounts

a purported statement of his transactions as executor in Virginia. The commissioner of accounts declined to allow several of the disbursements included in the statement, and in the year 1912 returned to the clerk's office a statement showing money received and paid out by the executor in his fiduciary capacity. Appearing in this statement was an item of $9,759.40 which purported to be a payment from Dowd, as executor in Virginia, to Dowd, as executor in New York. This settlement was never confirmed by the chancery court.

Immediately following the filing of this statement by Dowd, as executor, Charles E. Quincey, Jr., beneficiary under the will of his mother, Florence B. Quincey, and his father, Charles E. Quincey (tenant by the curtesy in certain of the property passing under the will), instituted a suit against Dowd and his sureties, the appellant and the National Surety Company, to surcharge and falsify the purported settlement and to require the sureties to pay such sums as might be found due by reason of Dowd's misappropriations and derelictions; to have the executorial account properly settled, and for general relief.

As a result of this litigation, a decree was entered fixing the indebtedness of Dowd, executor, at $10,966.72, as of December 24, 1911; of this amount the appellant was charged with the payment of $8,224.48 and the National Surety Company was charged with the payment of $2,742.24. The National Surety Company settled its liability by paying the sum of $2,000.00. The appellant, however, refused to abide by the decision of the trial court and the cause was appealed to the appellate court, which handed down a decision June 12, 1919, affirming the decree of the lower court and entering judgment for the full amount of $8,224.48. Included in this judgment was the sum of $3,500.00,

the aggregate of the three notes discounted by Dowd, executor, as set forth, *supra.*

Appellant, after paying the judgment rendered against it, made demand on White, Allan and the Savings Bank of Richmond for the sums alleged to be due it by them. Appellees refusing to accede to this demand, appellant on the 9th day of January, 1920, sued out of the clerk's office of the chancery court subpoenas in chancery against the appellees, returnable to the third Monday in January, 1920, on which last mentioned day appellant filed its bill of complaint alleging therein, among other things, the following:

"And your orator now alleges that the said David Meade White, Edgar Allan, Jr., and the Savings Bank of Richmond used the funds of the estate of Florence Belle Quincey in Virginia to pay the notes of the New York executor held by the Planters National Bank and the Savings Bank of Richmond, thereby creating *devastavits* of the Virginia estate, which relieved the said David Meade White and Edgar Allan, Jr., from their responsibility as endorsers on said notes, and also relieved the said Savings Bank of Richmond, by applying the Virginia assets on deposit with it to the payment of the notes of the New York executor, from loss on account of notes worthless except in so far as the endorsers thereon were responsible. And that your orator having paid as surety for the executor the full amount of such defalcations of the executor, it is subrogated to the rights of the estate of Florence Belle Quincey and Charles E. Quincey, Sr., and Charles E. Quincey, Jr., against said David Meade White, Edgar Allan, Jr., and Savings Bank of Richmond, and that it is now entitled to a decree against the said David Meade White and Edgar Allan, Jr., for the sum of thirty-five hundred dollars ($3,500.00) with interest on

$2,500.00 from June 15, 1910, on $500.00 from June 19, 1910, and on $500.00 from August 29, 1910, until paid, and against the Savings Bank of Richmond for the sum of one thousand dollars ($1,000.00) with interest on $500.00 from June 19, 1910, and on $500.00 from August 29, 1910.''

To this bill of complaint appellees demurred and the same being overruled they thereupon filed their respective answers denying any and all liability and interposing the plea of the statute of limitations, and relied on the equitable doctrine of laches.

The cause being submitted on the bill, answers, exhibits, and depositions of witnesses, the court, on the 2nd day of October, 1923, entered a decree in favor of appellees and dismissed the bill of complaint. It is this action of the chancellor which is the subject of review.

[1] The first material question involved in the suit is that of *res adjudicata.* It is forcibly contended by the appellees that the whole subject matter of this controversy has been disposed of by the decree entered in the suit of *American Surety Company* v. *Quincey*, 125 Va. 1, 99 S. E. 641.

In December, 1916, the appellant appeared before the court and filed a motion to make the appellees parties defendant along with appellant, in the Quincey suit, alleging as the reason therefor that full justice could not be done, and the whole controversy involved in the suit ended without the presence of appellees. This motion was denied by the chancellor, and the following decree entered:

"This day came the American Surety Company of New York, by counsel, and prayed the court to enter an order making parties defendant to this cause Planters National Bank of Richmond, Savings Bank of

Richmond, David Meade White and Edgar Allan, Jr., alleging as reason therefor that full justice cannot be done and the whole controversy involved in this cause ended without the presence of these parties, to the entry of which order the plaintiffs, by counsel, objected, and the court, having heard and maturely considered the argument of counsel on said motion, is of the opinion that the said motion should not be granted, and doth deny the same."

It is apparent from reading the decree that the chancellor did not have in mind a disposition of the question involved in the instant case. That the appellees be made parties defendant with appellant in the Quincey suit was not at all essential to a disposition of the question of the liability of appellant as surety on the bond of Willis Bruce Dowd, executor. The Quinceys were not concerned in the alleged liability of appellees to appellant as participators in the *devastavit* committed by Dowd. They had the legal right to sue appellant, without joining appellees as parties defendant, and they had the further right to have their case passed upon by the court, unhampered by the injection therein of extraneous issues, in which they had no interest.

If the contention of appellant that it was not liable to the Quinceys had prevailed, that would have been proof positive that appellees were not necessary parties defendant. If they had been made parties, all they could have done would have been to wait patiently until the question of the liability of appellant was settled, and then litigate the question with appellant as to their own liability if appellant lost its contention.

[2] Another view of the matter is, that the question of the introduction of new parties is a matter addressed to the sound discretion of the court and its action will

not be interfered with, unless the discretion has been abused.

In *Belton* v. *Apperson*, 26 Gratt. (67 Va.) 207, the rule is thus stated: "It is settled practice of courts of equity to allow an amendment of the bill by the introduction of new parties, plaintiffs or defendants, when necessary to the ends of justice or to prevent further litigation. As a general rule this is not a matter of course, but discretionary with the court. 1 Dan. Ch. Pr. 4, 405."

[3] That the appellate court sustained the action of the chancellor in the Quincey suit is not conclusive of the question that the court in so doing was disposing of the question as to the alleged liability of appellees. As a matter of fact, the action of the chancellor in over-ruling the motion of the appellant is not adverted to in the opinion of the court. There is no merit in this contention of appellees.

[4] The general principles of the doctrine of *res judicata* are well settled. In the last pronouncement of this court on the subject in the case of *City of Richmond* v. *Davis and others*, 135 Va. 319, 116 S. E. 492, Judge Burks, delivering the opinion of the court, said: "It is elementary that, in the case of successive suits, where the parties are the same, the issue is the same, and that issue has been decided on its merits by a court of competent jurisdiction, the judgment in the first suit is *res judicata*, and cannot be called in question in any subsequent suit between the same parties or their privies."

It is thus seen that, so far as the appellees are concerned, the only question in the Quincey case affecting them was the propriety of making them defendants to that suit. Until they were made parties they had no voice in the matter whatever. The merits of the in-

stant case were not involved nor passed upon either by the trial court or this court.

That this conclusion is sound is apparent from the following quotation from the decree entered in the Quincey suit: "* * and the court doth accordingly adjudge * * * that the said American Surety Company of New York be, and it is hereby, subrogated to all rights and remedies that the plaintiffs or either of them may have had against the said Willis Bruce Dowd, executor of Florence Belle Quincey, deceased, or any other person or corporation, on account of the transactions of Willis Bruce Dowd as executor of Florence Belle Quincey which were the subject of investigation and litigation in this suit; *but nothing herein is intended as expressing any opinion of the court as to the liability or nonliability of any such person or corporation.*"    (Italics ours.)

[5] This brings us to the consideration of the question of laches relied on by appellees in this cause.

The chancellor did not pass on this phase of the case, but proceeded to dispose of the controversy on the merits.    The claim of the appellant is a purely equitable claim; it is one based on the doctrine of subrogation, pure and simple.    Having paid, as surety, the amount of the three notes involved in this litigation, it asks to be subrogated to the rights of the estate of Florence Belle Quincey against appellees, as alleged participators in the *devastavit* of Dowd, executor of the Virginia estate.

[6] "While it is true that subrogation is the creature of equity, and essential justice is its object, it must be enforced with a due regard to the right, legal or equitable, of others.    It cannot be invoked so as to work injustice or defeat a legal right."    *Baugh & Sons* v. *Black*, 120 Va. 12, 90 S. E. 607; *Wolford* v. *Bias*, 79 W. Va. 349, 90 S. E. 875.

In this case the statute of limitations of five years has also been interposed by the appellees. The question regarding the application of the statute is a close one for the reason that the claim is purely equitable. In view, however, of the conclusion reached in the case, it is not essential to a decision to pass on the question.

[7] Professor Lile, in his notes on Equity Jurisdiction, pages 20-21, states that "where the right sought to be enforced is a purely equitable one (that is, one not recognized at law), and there is no express statutory bar, and no analogy to be followed because claims of the character asserted are unknown to the law courts, then equity applies its own peculiar rule of laches."

[8] In our view, this is the rule which should be applied in disposing of the instant case.

"Laches is the neglect to do something which a party ought to do * * ." Bell v. Woods, 94 Va. 683, 27 S. E. 506.

[9, 10] To recapitulate:

In October, 1910, appellant discovered that Dowd, executor, was not carrying out his private agreement with appellant that the funds of the executor were to be held pursuant to the joint control agreement, and accordingly applied to the court for release as surety. The court, also upon the motion of appellant, entered an order about October 26, 1910, requiring Dowd, as executor, to settle his accounts before the commissioner and to execute a new bond. The new bond was executed on the 22nd of December, 1910. On the 27th of December, 1910, Dowd, executor, filed with the commissioner of accounts a statement in which he sought credit for the identical items which are the subject of litigation. The commissioner declined to allow Dowd, executor, credit for the said items, and some time near the beginning of the year 1912 made his report to the court to this effect.

The filing of this report was notice of its contents to the appellant on whose motion the account was stated. Some time thereafter Charles E. Quincey, Jr., and his father, Charles E. Quincey, instituted their suit against Dowd, executor, and the appellant and National Surety Company as sureties on his bond, to recover the sum of $9,759.40, in which sum was included, as heretofore stated, the sum of $3,500.00, this being the amount of the three notes executed by Dowd as executor before his qualification in Virginia.

The appellant in a sworn answer denied any and all liability. It demurred to the bill and failing in this contention, it filed eleven exceptions to the report filed by the commissioner to whom the cause had been referred. Failing in all of its contentions in this respect, appellant was adjudged to be indebted to the Quinceys in the sum of $8,224.48. In the same decree judgment was entered against the National Surety Company, which was promptly settled. Appellant, instead of paying the amount decreed against it, appealed the cause to this court.

The judgment of the lower court was affirmed in a decision handed down June 12, 1919. Not until this action of the appellate court did the appellant concede its liability. When demand was made upon appellant in the year 1914, Dowd, the executor, was alive, a fact known to appellant, as the two were joint defendants to the Quincey suit. It knew that in the event it was subrogated to the rights of the Quinceys and recovered of appellees, that they in turn would have recourse against Dowd, executor. Yet with all these facts before it, appellant continued the litigation until the death of Dowd, in 1918. In the death of Dowd appellees have lost their recourse against him.

By reason of the delay caused by the action of ap-

pellant, fourteen years interest has accumulated on the principal sum of $3,500.00. We do not think it would be in conformity with equity and good conscience, under the facts and circumstances of this particular case, to permit a recovery by the appellant.

It may be argued that the liability of appellant was only fixed at the time of the payment of the Quincey judgment. It is true it took the judgment of the Supreme Court of Appeals to enforce payment by the appellant, but the liability of the appellant to Charles Quincey, Jr., and Charles Quincey became fixed the moment Dowd, as executor, committed the *devastavit*.

If appellant was mistaken as to the law, should appellees be made to suffer for this mistake? We think unquestionably the law should be that when a surety is sued on his or its bond to recover for a *devastavit* committed by the principal, and expects to hold liable any one who was a participant in the *devastavit* (without being guilty of fraud), then the surety is bound to elect whether he will pay the debt and be subrogated to the rights of the beneficiary, or will resist the claim of the beneficiary and take his chance, in the event he has to pay, of being met with the doctrine of laches, or the statute of limitations in a proper case. In other words, the surety will not be permitted to "blow hot" when resisting the claim against the principal and himself (or itself), and then be permitted to "blow cold" when he is met by the plea of the statute of limitations, or the doctrine of laches interposed by one wholly innocent of any fraud, and absolutely not guilty of concerting with the principal to commit a *devastavit*. The law rewards the diligent, while the slothful must bear the pains and penalties of his neglect.

If the contention of the appellant be sound at this

time, it was sound when the defalcation of Dowd was discovered. It will at least be assumed that the appellee bank was solvent at that time and the $1,000.00 alleged to be due from it could have been collected. The whole trouble in the case is (conceding for the sake of argument that appellees are liable) that appellant was seeking to avoid the payment to the Quinceys of the full amount afterwards adjudged against it. To acknowledge a part was to acknowledge all. Hence, no doubt this accounts for the delay in seeking to enforce its alleged claim against appellees.

[11] In *Ruckman* v. *Cox*, 63 Va. 74, 59 S. E. 760, it is said: "Every case is governed chiefly by its own circumstances; sometimes the analogy of the statute of limitation is applied; sometimes a longer period than that prescribed by the statute is required; in some cases a shorter time is sufficient; and sometimes the rule is applied where there is no statuable bar. It is competent for the court to apply the inherent principles of its own system of jurisprudence, and to decide accordingly."

To the instant case the foregoing beneficent principles are peculiarly applicable.

There is no allegation in the bill of complaint that appellees were guilty of any fraud, actual or implied. There is nothing in the evidence to show that appellees deliberately concerted with Dowd, executor, to commit waste. The situation was a novel one. By reason of the faith reposed in him by Mrs. Quincey, Dowd was held out to the world as a man of honor. Appellees, White and Allan, had been the trusted attorneys of Mrs. Quincey during her life, and were the protectors of her estate after her demise, by virtue of their employment by the executor.

The estate in New York was of value, how much the

record does not disclose; in Virginia the estate was a most valuable one. The appeal is made to the attorneys in Virginia to come to the aid of the New York estate. They relied upon the integrity of Dowd and did what they thought was for the best interest of those they represented. If they derived any profit, the evidence fails to disclose it. In a memorandum filed with the record, the chancellor, Honorable William A. Moncure, uses this language: "In all these transactions the defendants acted in the utmost good faith. Never suspecting for a moment that Dowd would then or at any time thereafter create a *devastavit* of the estate.

"In this connection it may be emphasized that White, Allan and the bank received no benefit from the proceeds of the notes discounted, but the entire proceeds were paid over to Dowd, executor, honestly believing that they would be applied by Dowd for the benefit of the estate and for its protection; when the notes were paid they entertained still the belief that the proceeds of the notes had been so applied.

"Acting thus honestly and without profit to themselves, and without knowledge, or suspicion, that Dowd would do anything wrong, and without intending to collude with Dowd in any wrongdoing, does the law come in and thus harshly impose on them the liability of paying this money to anyone?

"I cannot think, and do not believe, that the law demands such great injustice."

Being of the opinion that the ends of justice have been fully met by the manner in which the case has been disposed of by the decree entered by the lower court, the case will be affirmed.

*Affirmed.*