# Richmond

MEYER KOTEEN, ET ALS. V. FRANCES BEAR BICKERS, ET AL.

November 15, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*James G. Martin* and *Fred E. Martin,* for the appellants.

*Haas & Haas,* for the appellees.

HOLT, J., delivered the opinion of the court.

Solomon Bear, a Jewish merchant, lived in the town of Shenandoah, Page county. He died testate in March, 1927, leaving to survive him as his legatees and distributees, two daughters, Frances Bear Bickers and Pearl Bear Harrison. These daughters are plaintiffs in the court below. This decedent in his will appointed his nephew, Meyer Koteen,

executor and trustee. Koteen, who lived in Norfolk, quali-
fied under this will, proceeded to administer the estate, and
made *ex parte* settlements, showing just what had been
done. These settlements the bill in this case seeks to sur-
charge and falsify.

Defendants named are Meyer Koteen and the United
States Fidelity and Guaranty Company which had qualified
as surety on his official bond. The surety company con-
tends that it is not a proper party to this suit in equity,
and under the provisions of Code, section 6102, prays to be
dismissed. That motion was overruled and error is thus
assigned:

"The circuit court erred in entering the decree against
the United States Fidelity and Guaranty Company, because
that company was not a proper party defendant to this suit,
there was no jurisdiction in equity, and no right in the
court to decree against the surety in this suit, that com-
pany being merely surety upon the bond of Meyer Koteen."

We are cited to *Allen* v. *Cunningham*, 3 Leigh (30 Va.)
395, where it was said:

"This court by a series of decisions, had settled it as
the law, that, before an action could be brought on the bond
of an executor or administrator to charge his sureties, there
must have been, 1, a suit against the representative to
establish the demand, and 2, a suit to fix the *devastavit*.
The legislature, thinking this intermediate suit unneces-
sary, passed a statute in 1814, dispensing with it: this
statute, in the revision of 1819, forms the 63rd section of
the statute of wills, 1 Rev. Code, ch. 104, page 390. It is
seen, at a glance, that the sole object of that statute was to
take away the necessity of the second action. The legis-
lature never dreamed of changing, or even of explaining,
the existing law, as to the person who might sue on the
bond; * * *."

Before a creditor could bring an action upon such a bond
he had to do two things. He had to bring an action to
establish his demand and he had to bring another action to
fix the *devastavit*. And it was in view of this somewhat

complicated situation that the legislature passed the act to which Judge Carr refers. It appears in the Code of 1819 as section 63 of chapter 104, vol. 1, page 390, and reads:

"When any person or persons shall have heretofore recovered, or shall hereafter recover any judgment against executors or administrators, in their representative character; and, upon execution issued upon such judgment, it shall be returned that there are not found, in the possession of the said executors or administrators, sufficient assets of the testator or intestate to pay and satisfy the whole, or any part of such judgment (costs excepted), such person or persons, recovering such judgment, his, her or their executors or administrators, may, upon such return of the execution as aforesaid, immediately commence and prosecute his, her or their action, against such executors or administrators, and their securities, or against either of them, or the executors or administrators' of either of them, upon the bond given by them, for the performance of the duties of such executors or administrators; in which said action the defendants may plead any plea or pleas, and in support thereof offer any evidence, which would be legally admissible in any action against executors or administrators suggesting a *devastavit*."

The substance of this statute appears in our present Code, section 5388, as amended by Acts 1920, chapter 24, and in this form:

"When an execution on a judgment or decree against a personal representative is returned without being satisfied, there may be forthwith brought and prosecuted an action against the obligors in any bond given by such personal representative for the faithful discharge of his duties."

This section deals with creditors and with actions against obligors on bonds, but as early as 1807 it was held that a judgment creditor whose execution was returned "no effects" might in equity proceed directly against obligors on an executorial bond.

In *Clarke* v. *Webb*, 2 Hen. & M. (12 Va.) 9, the court said:

"The rule of law as laid down by the Supreme Court in the case of *Braxton* v. *Winslow,* 1 Wash. (1 Va.) 31, is well understood and admitted, that, at law, the security of an executor shall not be made liable for a *devastavit* committed by his principal, until it has been fixed upon him by a suit; but, although this be the case, at law, yet, surely, a creditor, after a judgment and the return of an execution, 'no effects,' may either proceed against the executors for a *devastavit,* according to the rule laid down in that case, or may bring his bill in equity to have a discovery of the assets: and such is the present case. The court should therefore entertain the cause, and settle all disputes between the parties: but, to do this, all the parties (however remotely concerned in interest), against whom a decree can be rendered, must be before the court; and therefore, it was right, in this case, to make Judge Lyons a party. His demurrer must be overruled; and he must be directed to answer. Surely it is unnecessary to cite authorities to prove such plain principles."

Judge Lyons contended, as counsel here contends, that a *devastavit* should have been previously established in some independent proceeding, but the court said not so, that equity had jurisdiction.

This equity practice, authoritatively stated, was not changed by the statute of 1814, carried, as we have seen, into the Code of 1819. That statute was designed to simplify and not to complicate proceedings already burdened with circumlocutions, and while it was always necessary that a creditor establish his debts it is plain that an heir and distributee named in a will does not have to go into court to prove that she is an heir, distributee and legatee. Here the plaintiffs are designated as daughters in the will. Their rights rest upon no unavailing execution.

The distinction between legatees and creditors clearly appears in *Taliaferro's Ex'rs* v. *Thornton,* 6 Call (10 Va.) 21. That decision is thus stated in the syllabus:

"Although in the case of a creditor, the demand must be established against the executor before a suit can

be brought on the administration bond, yet in the case of a legatee, a suit in equity may be brought upon it in the first instance, because the decree can be made so as to operate against the executor in the first instance, and an account of the assets can be taken at once."

In 3 Minor's Inst. (2d Ed.) Part 1, pp. 574-75, is this statement:

"The remedy on the bond of a personal representative must, of course, be predicated upon some satisfactory evidence that he has violated the conditions of the bond, by wasting the assets committed to him, which is technically known as a *devastavit*. This evidence, as far as creditors are concerned, is generally afforded by obtaining judgment against the personal representatives as such, issuing an execution of *fieri facias* thereupon, and having it *returned* by the sheriff or other officer '*no effects.*'

\* \* \* \* \* \* \* \*

"The remedy, then, on the bond of an executor or administrator requires us to note, (1) The proof to be made of the *devastavit* or wasting of the assets by the personal representative; and (2) The action or proceeding on the bond to subject him therefor;

"1. The proof to be made of the *devastavit*.

"This proof may be made, as we have seen, by, (1) judgment against the personal representative as such in favor of a *creditor of the estate,* and a return of the execution 'no effects'; and (2) bill in equity to cause the personal representative to settle his accounts before a commissioner of the court; or (3) by an *ex parte* settlement required to be made annually before the commissioner of accounts."

Even where proof of *devastavit* is necessary it may be supplied by an *ex parte* settlement, for such settlement is *prima facie* evidence of matters there set out. *Leake's Ex'r v. Leake,* 75 Va. 792; *American Surety Co.* v. *Quincey,* 125 Va. 1, 99 S. E. 641.

The cause of *Leake's Ex'r* v. *Leake, supra,* is an excellent example of Virginia practice. The opinion is by Judge Staples. The litigants were represented by distinguished

counsel. For appellants Sands, Leake and Carter, and Haw and Waddell, appeared. Appellees were represented by Major Robert H. Stiles and Judge William J. Robertson. In that suit it appears that Samuel Leake, in 1859, died testate. Wellington Godwin was named his executor and qualified. On his executorial bond James L. Apperson, James M. Taylor and Lucian B. Price appeared as sureties. The executor immediately converted all of the estate except the slaves into money. In a short time thereafter Walter Leake, on behalf of himself and other legatees, brought suit against the executor for a construction of the will and for directions as to distribution. The executor answered and said that all debts had been paid. All of this occurred in 1859. In 1860, Shelton F. Leake brought an action of assumpsit against the executor in which he claimed $10,000 for services rendered to testator, and, in 1870, he obtained a judgment for $6,133.33. When the action was brought the executor had in hand $25,000. Of it he distributed $15,000 and the remainder, under an *ex parte* order of court, he invested in Confederate bonds.

In 1871, Shelton F. Leake brought suit against the executor and his sureties in which he set up his judgment and charged the executor with a *devastavit* in the administration of his trust. The court took jurisdiction and decreed against them. In Judge Staples' opinion Judges Christian, Anderson, and Burks concurred. Want of jurisdiction was nowhere suggested as to the sureties, doubtless because counsel and court were familiar with the case of *Clarke* v. *Webb, supra,* and many other Virginia cases which had followed it as a matter of course.

This last named case goes beyond the *Leake Case* and the case in judgment, in that it held that proof of *devastavit* is not necessary in an equity suit.

As showing the general practice in Virginia we refer to the following cases: *Toler's Adm'r* v. *Toler,* 2 Pat. & H. 71; *Tarr* v. *Ravenscroft,* 12 Gratt. (53 Va.) 642; *American Surety Co.* v. *Quincey,* 125 Va. 1, 99 S. E. 641. In each of these suits it appears that an *ex parte* settlement had

been made. But that is not always necessary. An executor might refuse to make one. We have seen in *Clarke* v. *Webb, supra,* that a creditor after judgment could proceed directly in equity for a discovery of assets and for an accounting. In all of them was done the thing which appellants say cannot be done. In one suit the personal representatives and their sureties are joined as defendants. Of course distributees and heirs at law cannot reduce their claims to judgment.

Appellants rely upon *Call* v. *Ruffin,* 1 Call (5 Va.) 333. That was a proceeding at law, and rests upon *Braxton* v. *Winslow,* 1 Wash. (1 Va.) 31, which was also an action at law.

It is said that *Tarr* v. *Ravenscroft, supra,* does not apply because the principal was insolvent and so comes within a recognized exception. The court did not place the right of the residuary legatee to maintain a suit upon this ground. Moreover, if it be always necessary that a *devastavit* be proven in some independent proceeding, the reason therefor would apply whether the executor be insolvent or not, for an insolvent executor may still have administered properly upon the estate of his decedent.

It is also said that in the *American Surety Company Case* the executor was a nonresident, thus bringing that suit within another exception to the general rule which gives equity jurisdiction. Of course no judgment can be gotten against a nonresident, and so the exception relieves a creditor from the burden of securing it. But no such burden rests upon legatees and distributees. The practice assailed is a good practice; it prevents a multiplicity of suits and gives to the court power to do complete justice in the first instance.

■ Whatever may be the law elsewhere, the uniform practice in Virginia permits a legatee to join in one suit an executor and his surety wherever there is an attempt to discover assets or to surcharge and falsify an *ex parte* settlement.

■ Before taking up those assignments which deal with

individual items in the *ex parte* settlements we should look to the character of the trust imposed. The testator said in the eleventh clause of his will:

"* * * My said trustee, his heirs, executors and administrators, shall be charged and chargeable only, for and with his own receipts, payments, acts and wilful defaults, and not otherwise, and shall not be charged or chargeable with or for any sum or sums of money, other than such as shall actually and respectively come to his hands, by virtue of this my will, nor with or for any loss or damages which may happen, in or about the execution of all or any of the trusts hereby in him reposed, without wilful default. Provided always, and I hereby declare, that the said trustee of this my will, who is now and shall be an attorney at law, may act as such attorney of my estate, and shall be entitled to charge and shall be paid for business done by him as such attorney in respect of my estate, in the same manner as if he had not been a trustee or executor of this my will, and for the time which he shall necessarily or properly employ in the execution of his duties as a trustee."

Of course this executorial trustee was not relieved from all responsibility. Had that been the testator's purpose he would not have required "security of some responsible bonding company for the proper discharge of his duties." He was required to act in good faith and with ordinary care.

The first item is one of $43.49.

■ There came into the hands of the executor small store accounts amounting to $435. He turned them over for collection to his brother-in-law, Mr. Shapero, of Norfolk, who in turn sent them to Mr. Bickers, a lawyer at Shenandoah, and a brother-in-law of Frances Bear Bickers. Mr. Bickers was paid for his services; Mr. Shapero also claimed that he should have been paid ten per centum of the sum realized. There was no occasion whatever for placing these accounts in the hands of a Norfolk lawyer and his claim of $43.49 was properly disallowed.

■ The trial court has charged the executor with $2,010. That charge came about in this way: Bear, who was a

retail merchant, left a stock of goods in his store at Shenandoah. It consisted in the main of clothes for women and children, "art goods" and dry goods of the kind incident to such a business. Its cost price was $3,958.77 and it was appraised at $2,500.

The sale was adequately advertised by handbills and in a local paper. This method of advertisement was adopted after an exchange of views between Mr. Koteen and Mr. Bickers. The stock was offered as a whole and there was no bidder. Efforts looking to a private sale were made. Apparently the best bid that could be secured was one made by a Mr. Foltz through Mrs. Bickers. That was a bid of $800 for merchandise, coupled with the provision that he should have the right to purchase certain real estate for $5,000. This offer was refused, possibly because of the conditions annexed, and no other was secured. Koteen undertook to sell in Charlottesville, but without success. He then shipped this stock to Norfolk where it was sold at auction at retail and brought net $490. There is some evidence tending to show that Koteen had already sold to Morris Gross, the auctioneer who went with him from Norfolk to Shenandoah, for $525, and that Gross and not Koteen was the vendor at the Norfolk sale. Koteen says that the sale to Gross fell through. However that may be, the Norfolk sale was advertised; from it only $490 was realized, and the executor has been charged with the difference between that sum and the appraised value of $2,500.

Undoubtedly the difference is very great, but the record shows that everything was done which could reasonably have been expected in order to effect an advantageous sale in Shenandoah, and in Norfolk there was a public sale after proper advertisement. Nothing more could have been done unless Koteen had elected to sell at retail in Shenandoah. Common experience has shown this to be a hazardous venture. The executor could not have personally supervised it and its proceeds might have been to a large extent absorbed by costs. A failure to adopt such a course, at the

most, was but a mistake in judgment. We think that the record does not justify this charge of $2,010.

■ Koteen took with him from Norfolk to the auction sale in Shenandoah an auctioneer, Morris Gross, and has paid him for his services $500. Mr. Bickers had written to the executor saying that there might probably be some agreement among prospective buyers to chill the bidding. This information possibly justified the employment of an outside auctioneer. One was employed and he has been allowed a fee of only $10. That is too little and $500 is too much. Ten dollars was not enough by half to pay traveling expenses; $100 is fair compensation for expenses and services.

■ The next item challenged is the payment of a fee of $100 by the executor to himself as attorney for services in the Foltz lease. There was some controversy with this tenant, but the executor did not at the time consider his services of sufficient moment to entitle him to a fee, and it was not until the claim for double commission as executor and trustee had been rejected that this charge was made. It was properly rejected.

■ The trial court also disallowed a charge of $100.75, cost of the first advertisement made of the Goodman property on which the executor had put an $11,000 loan. There was a sale to one Moses Glasser. Koteen thought that the price was inadequate and refused to comply. Glasser brought a suit for specific performance. Koteen answered and set up three defenses. He said that the advertisement was of doubtful sufficiency; that if the note should be construed to be held by him as trustee for his decedent, he could not act as trustee in the sale of this real estate; and that if it was held by the daughters, he had failed to obtain from them a request for sale. Specific performance was denied, and the sale fell through because of Koteen's own conduct. This item was properly rejected.

■ Complaint is next made of an item of $550, fees charged by Koteen for services in and about the Goodman loan. Goodman wished to borrow $13,000 to be secured by

a deed of trust on real estate assessed for taxation at $7,-740. It was already encumbered by liens aggregating something over $10,000. Koteen was willing to lend $11,000, and did lend that sum, and also secured a loan of $2,000 from a Mr. Frieden who took a second mortgage.

Under contract Goodman was to pay Koteen for "services in obtaining and closing the said loan, and for the examination of title to both pieces of property, preparation of deed of trust and recording the same, an amount equivalent to five (5%) per centum of the said thirteen thousand ($13,000) dollar loan."

Under the provisions of clause 11 of decedent's will Koteen was given power to act as counsel for himself in the administration of his trust, and to be paid out of the estate, and was not to be chargeable with "any sum or sums of money, other than such as shall actually and respectively come to his hand by virtue of this my will." The contract with Goodman actually was a benefit and not a detriment to the trust. It lost nothing by virtue of it, and so should not be permitted to recover anything which Goodman paid. This conclusion is strengthened by the fact that Koteen, in making this loan, acted in good faith, and that no loss which grew out of it was due to any "wilful default" on his part.

The Goodman loan was made in 1927 on property then assessed for taxation at $7,740. Under Code, section 5431, as amended by Acts 1928, chapter 427, trustees may invest in first lien mortgages not to exceed eighty per centum, now sixty per centum, of the fair market value of real estate securing them. But this is not mandatory. All that the statute means to say is that the trustee shall be relieved from liability if he does make such an investment. Harrison on Wills, section 381. Whether or not other investments are such as a reasonably prudent man would make is a question of fact. This loan was made at a time when few people had any just idea as to the value of real estate, and at a time when no one could foresee the serious depression in values which was to follow. In 1930 properties pledged were sold and purchased by Glasser for

$10,025. Koteen thought the price was too little and refused to confirm the sale. Later he advertised and sold at public auction these Goodman lands for $10,275. The net proceeds of this sale was $9,735 and the loss suffered was $2,123. It is claimed that the executorial trustee should make this good. As evidence of what this property was thought to be worth when the loan was made Frieden lent $2,000 on the second mortgage. Certain payments were made to him on it, and as late as 1929 he renewed that $2,000 loan and put $1,200 new money into it. It is a matter of common knowledge that unnumbered prudent investors lost money on first mortgage loans made during the period of inflated values, and measured by their experience Koteen came out rather well. The trial court was of the opinion that there was no want of ordinary care on his part, and its opinion was sustained by the record.

 Next it is said that the court erred in allowing this executorial trustee a commission of seven per centum. Five per centum is ordinary compensation, but Koteen was something more than an ordinary executor. The allowance is always within the sound discretion of the court. See *Jones* v. *Virginia Trust Co.*, 142 Va. 229, 128 S. E. 533, in which Judge Campbell makes a comprehensive statement of the Virginia law after reviewing all the authorities. See, also, *Trotman* v. *Trotman*, 148 Va. 860, 139 S. E. 490.

 It is next said that credit should not be allowed for counsel fees aggregating $1,100 paid to Mr. J. G. Martin. The testator, in the tenth clause of his will gave the bulk of his estate to eight Jewish institutions on condition that in each of them a worthy Shamus should render Kodesh services in his memory daily for one year, and thereafter annually so long as the world should stand. This pious purpose was dear to the testator's heart and it was right and proper that his testamentary representative should respect it. It was attacked in a suit brought by the appellees here and was set aside, all of which inured to the benefit of the daughters. No contest is made as to the amount of the fee,

but it is said that it should not be charged against the estate.

In *Butt* v. *Murden,* 154 Va. 10, 152 S. E. 330, 331, 69 A. L. R. 1048, Judge Prentis quoted with approval this statement of the law made in a note 18 Am. & Eng. Anno. Cases 741:

"The decided weight of authority supports the rule indicated in the reported case, to the effect that after the will has been duly probated it is the duty of the executor named therein to defend suits brought to revoke such probate or to test the validity of the will, and if he acts in good faith he is entitled to receive from the estate his necessary expenditures in defending such attack."

Judge Prentis said that in most cases the contest was ordinarily between those who take under the will and those who would take under the law of descents and distributions, and that they should be left to fight it out, but "if the executor acts in good faith he is generally entitled to reasonable allowances." Here the decedent was a Jew and his trustee and nephew is a Jew; the purpose of the contested provisions must have appeared to them to have been proper and commendable. We see no evidence of lack of "good faith" in this nephew's undertaking to carry out his uncle's wishes, or that his attempt to do so manifested any want of it.

▇▇ It is said that there should have been no allowance made to Bickers for his collection of store accounts. This claim is without merit.

▇▇ Twenty-five dollars was paid for freight on goods shipped to Norfolk. It is said that these goods had already been sold to Gross and that he should have paid the freight. The trial court did not think that any such sale had been proven, and we accept its judgment as to this item.

▇▇ Final objection is made to an item of $35 paid the clerk of the Circuit Court of Page county for a copy of the record in that suit in which the religious trusts were assailed. We think the charge proper.

There are certain inconsequential items contested by the appellants. The amount is small and we have accepted,

without discussion, the judgment of the trial court as to them.

In view of the many items involved, this cause, which is reversed, should be remanded, to the end that a commissioner may restate Koteen's account in the light of this opinion.

*Reversed and remanded.*