## McGuigan Estate.

Argued March 21, 1944.  Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*Oliver K. Eaton,* for appellant No. 60.

*Harbaugh Miller,* with him *Donald Thompson,* for appellant No. 61.

*Vincent R. Smith,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, May 22, 1944:

There are two appeals.  One is by an aged non-resident, of conceded mental capacity, who assigns as error the refusal of the court below to vacate its decree appointing guardians for her estate within this Commonwealth.  The other is by the surety of a removed guardian, of the same estate, from a judgment entered against it on the audit of the account of the removed guardian.

Appellant, Emma E. L. McGuigan, is a resident of Los Angeles, California.  She is a widow, with no children or grandchildren.  At the commencement of these proceedings she was apparently 75 years of age.  On April 7, 1941 the California court appointed Louis Day, of Los Angeles, California, (in whose family Mrs. Mc-

Guigan resides) as guardian of her person and estate. In the California petition for the appointment of the guardian it was averred that Mrs. McGuigan was "in possession of her mental faculties with due allowance for her age". The declared purpose of the appointment was that Mrs. McGuigan was "in need of constant care because of the infirmities of old age". The order making the appointment recited that she ". . . is unable, unassisted, to manage and take care of herself or her property". It was also averred that Mrs. McGuigan had "given Power of Attorney to a woman, [resident in Pennsylvania] inexperienced in law or business"; and that she desired ". . . a Guardian be appointed for her affairs within the State of Pennsylvania, where she is possessed of property".

On May 7, 1941, Louis Day, the non-resident guardian of the estate of Mrs. McGuigan, the non-resident adult, petitioned the Court of Common Pleas of Westmoreland County, Pennsylvania, for appointment as guardian of Mrs. McGuigan's estate in this Commonwealth. Attached to the petition was a copy of the California decree of appointment quoted above. On the same day, the petition was granted. These words are contained in the order: "(appellant) is not able, owing to her advanced age and general weakness, to take care of her property". A surety bond was ordered in the sum of $30,000, which was filed the next day by Day and his corporate surety (appellant in the second appeal herein).

It is to be observed that neither in the original proceeding in California nor in the subsequent one in Pennsylvania, was there averment or proof that appellant was incapacitated by reason of *mental weakness*.

Day, the Pennsylvania guardian, on June 2, 1941, received from Jennie L. Steiner, a resident of Westmoreland County, and a niece of appellant, the sum of $7,760.50 belonging to Mrs. McGuigan, which, with other moneys, Mrs. Steiner had collected for her under a power of attorney dated October 5, 1940. This sum was removed by Day to California.

On July 19, 1941, Mrs. Steiner filed a petition in the court below, alleging that Mrs. McGuigan is a resident of Westmoreland County and that the Los Angeles court was without jurisdiction to appoint Day her guardian. It was also averred that the Westmoreland County court had no power to appoint a guardian for Mrs. McGuigan in that county upon the grounds recited in the order. The petitioner asserted that the general power of attorney given to her by Mrs. McGuigan was still "valid and subsisting", and requested the court to revoke the appointment of Day as guardian in Westmoreland County.

A copy of this petition was served upon the resident attorney of Day, and upon Day by registered mail, together with a rule to show cause why his appointment should not be revoked. No answer having been filed, the court below, on August 13, 1941, entered a decree revoking the appointment of Day and directing him to file his account. In the same decree, however, the learned president judge asserted that it appeared by "duly authenticated papers" that the California court "duly found Emma E. L. McGuigan to be incompetent by reason of *mental weakness* to properly care for her property according to the laws of the State of California," and that it "further" appeared to be "necessary that a guardian be appointed for Emma E. L. McGuigan, of the assets situate in the Commonwealth of Pennsylvania." It may be noted that no notice appears to have been given to the subject of this litigation, her residence being conceded by the courts to be in California, and no testimony as to her mental condition was introduced. Pursuant to its "finding", the court appointed Mrs. Steiner and the First National Bank in Greensburg guardians of the estate of Mrs. McGuigan in Pennsylvania.

Louis Day having failed to file his account, the new guardians petitioned the court to adjudge him in contempt of its order, which it did on November 25, 1941. Thereafter, on December 1, 1941, the same petitioners requested the court to take testimony to determine what

surcharge, if any, should be made against Day. The court fixed a day for hearing, but in the interim, Mrs. McGuigan, the object of all this solicitude, filed her own petition averring that she is a resident of California, that on October 23, 1941, the Superior Court in Los Angeles had adjudged her competent and capable of managing her own property, and requesting the court below to vacate its appointment of Mrs. Steiner and the First National Bank in Greensburg as appellant's guardians. The court issued a rule upon the two Pennsylvania guardians to show cause why their appointment should not be vacated, but pending the return day, heard the testimony of Mrs. Steiner, *ex parte,* concerning the assets delivered by her to Day. Thereafter the Pennsylvania guardians filed an answer to Mrs. McGuigan's petition, averring that their appointment, not having been appealed from, was *res adjudicata;* that the California court had no jurisdiction to pass upon the competency of Mrs. McGuigan because all of her assets were located in Pennsylvania, and that she had not complied with the laws of this State regarding the establishment of her restoration to competency. After argument, the court dismissed Mrs. McGuigan's petition because the statutory procedure for the discharge of domestic guardians had not been followed. This order was filed March 23, 1942. An appeal was taken to this court by Mrs. McGuigan, but it was discontinued.

On October 2, 1942, no further proceedings having been taken, the court entered an order surcharging Day in the amount of $7,760.50 less costs and counsel fees. This was followed, on November 9, 1942, by an order directing the Pennsylvania guardians to proceed against Day's surety. The surety company filed a petition setting forth its interest and requesting the court to accept an accompanying report by Day as his account. The petition further asked that the surcharge be vacated, that the report be audited, and that Day be credited with certain expenditures authorized by the Los Angeles court.

A petition was filed by Mrs. McGuigan, expressly approving the report filed on behalf of Day. The report itself contained the allegation that Mrs. Steiner, one of the Pennsylvania guardians, had fraudulently deprived Day and his ward of $2,000. out of the fund collected by Mrs. Steiner under her letter of attorney from Mrs. McGuigan. He recited the investment of the fund received by him in certain securities approved by the Los Angeles court, and claimed credit for payments made to the ward for support, and for certain expenses of administration.

Before action was taken on this report, Mrs. McGuigan, on March 26, 1943, filed a second petition to vacate the appointment of her guardians in this State, alleging that the court below was entirely without jurisdiction in the matter and that all of its orders and decrees were nullities. An answer to this petition was filed by Mrs. Steiner and the Greensburg bank, who also filed exceptions to the report of Louis Day.

Disposing of the petition of Mrs. McGuigan and the account of Louis Day simultaneously, the court below, on July 13, 1943, filed an opinion asserting that its jurisdiction and its appointment of Mrs. Steiner and the Greensburg bank were *res adjudicata*. It then proceeded to sustain the exceptions to the account of Day as to all items of expenditure by him after the date when his appointment as guardian in this State was revoked, except for payments to the ward for her support, and bond premiums. The fact that the ward and the Los Angeles court, within whose jurisdiction the ward and guardian resided, had approved expenditures for which Day claimed credit, was completely disregarded. The court also assumed jurisdiction to enter judgment against the National Surety Corporation for the reduced surcharge on the ground that it had become a party to the proceedings by its petition on Day's behalf, and that it had notice of the audit because the same counsel filed the petitions for Day and the surety. To this judgment and decree exceptions were filed by Mrs. McGuigan and by

the surety, which pointed out that a suit against the surety on its bond was pending in the Federal court. These exceptiions were dismissed and separate appeals were taken by the surety and Mrs. McGuigan.

The court below had no jurisdiction to appoint guardians for a non-resident adult in the facts of this case. The right of every person to possess and enjoy his or her own property is recognized by both the Federal Constitution and the Constitution of this Commonwealth. Where, because of *mental* incompetence, that right cannot be exercised personally by the owner of property, but is actually in jeopardy, the right of personal control may be qualified by the State and the property of the incompetent may be placed in public custody for the benefit of its owner. Thus, under the common law of England, lunatics, imbeciles, and persons of unsound mind, were declared wards of the Crown, and a guardian, accountable to the courts of the sovereign, was appointed to conserve their property. See *Ex Parte Barnsley,* 3 Atk. 168, 26 Eng. Reprint 899; *Donegal's Case,* 2 Ves. Sr. 408, 28 Eng. Reprint 260; *Ridgeway v. Darwin,* 8 Ves. Jr. 65, 32 Eng. Reprint 275; *Ex Parte Cranmer,* 12 Ves. Jr. 445, 33 Eng. Reprint 168; *Re Holmes,* 4 Russ. 182, 38 Eng. Reprint 774. In this Commonwealth, similar power is vested in the courts, subject to the qualification that it may be exercised only in the manner prescribed by the legislature. See *Commonwealth v. Schneider,* 59 Pa. 328; *Tarr's Estate,* 10 Pa. Superior Ct. 554. Similar considerations apply to minors.

By the Act of June 13, 1836, P. L. 589, as amended, 50 PS section 691, the courts of common pleas were authorized to appoint guardians for the estates of lunatics and habitual drunkards. This act has always been strictly construed, and was expressly held, in *Commonwealth v. Schneider,* supra, not to apply to persons of weak mind who were not lunatics or habitual drunkards. As to residents, lunacy and habitual drunkenness could be established only by commission and inquisition. As

to non-residents, Section 18 (50 PS section 736), authorized the appointment of a committee for the person or estate of the lunatic or habitual drunkard in this Commonwealth upon proof of the finding by a competent court in the place of residence that, according to the laws of that place, the requisite mental state existed.

The Act of May 28, 1907, P. L. 292, as amended by the Act of April 1, 1925, P. L. 101, Section 1, 50 PS section 941, makes similar provision for guardianship of the estate of weak-minded persons. These laws are *in pari materia* with the lunacy acts, and have received parallel construction. See *Hoffman's Estate,* 209 Pa. 357, 58 A. 665.

Under the Act of 1907, as amended, the courts of common pleas may appoint a guardian for the estate of any resident who "shall become insane or feeble-minded or epileptic, or so *mentally* defective that he or she is unable to take care of his or her property, and in consequence thereof is liable to dissipate or lose the same". This definition has been construed very strictly to refer only to *mental incapacity,* and not to incapacity resulting from purely *physical* infirmities. *Bryden's Estate,* 211 Pa. 633, 61 A. 250; *Hoffman's Estate,* supra; *Ryman's Case,* 139 Pa. Superior Ct. 212. In the *Hoffman* case it was pointed out that this is "a dangerous statute easily capable of abuse", and it was held that the proof of *mental* incapacity must clearly meet the terms of the law before any persons should be deprived, under it, of the right to manage his or her own property. The presumption of sanity and mental capacity cannot be lightly overthrown.

The Act of 1907 contained no provision for the appointment of guardians for the estates of non-resident mental incompetents. This was supplied by the Act of April 27, 1909, P. L. 185, Section 1, 50 PS section 991, which provided: "In the case of a person residing out of this Commonwealth, and *duly found or proved to be incapacitated by reason of mental weakness* to properly

care for his or her property, according to the laws of the place in which he or she shall reside, it shall be lawful for the court of common pleas of any county of this Commonwealth to admit copies of the proceedings in such case, duly authenticated, as sufficient proof for the appointment of a guardian of the estate of such person, situate in this Commonwealth."

As our lunacy laws clearly had no application to this case, and as Mrs. McGuigan was admittedly a nonresident, the only justification possible for the orders of the court below, depriving her of the control and management of her property in this Commonwealth, must be found in the quoted portion of the Act of 1909. The Act affords no such justification. The record discloses that at no time was Mrs. McGuigan "duly found or proved to be incapacitated by reason of *mental* weakness". On the contrary, the copies of the California petition and decree show that it was conceded in the guardianship proceedings that "she is in possession of her mental faculties with due allowance for her age."

Confronted with this insufficiency of proof, and with the erroneous statement of its learned president judge that the California court had "duly found" Mrs. McGuigan "incompetent by reason of mental weakness", the court below states in its opinion that the determination of the California court was *tantamount* to a finding of mental incapacity and that the "intention of the laws of each State are an attempt to arrive at the same end", even though they do not employ the same language. This assumption was not only unwarranted on the face of the record, but was contrary to the facts there appearing.

The statutes of California regarding the appointment of guardians for incompetent residents are much broader than our own. Such a person is described in Section 1767 of the Code of Civil Procedure 1923 of that State as, "any person, who, though not insane, is, by reason of *old age, disease, weakness of mind, or from any other cause,* unable, unassisted, to properly manage and take

care of himself or his property. . . ." This clearly includes physical incompetency. Our statutes, as previously shown, require mental incompetency as *distinguished* by our cases from physical infirmity.

The California courts have sustained the constitutionality of this portion of the Code (see *Re Coburn,* 165 Calif. 202, 131 P. 352) and under it we must assume that Louis Day was properly appointed guardian of Mrs. McGuigan's property in that State. Obviously, however, the California legislature could not, by enlarging the scope of its guardianship laws, enlarge the powers of our courts under our statutes. Whatever Day's powers may have been in California, he had, as a foreign guardian of a non-resident, no powers in this Commonwealth over the property of his ward by virtue of his foreign appointment. In *Goodrich, Conflict of Laws* (2d ed. 1938), at page 504, it is stated, citing *Hoyt v. Sprague,* 103 U. S. 613: "By the common law, a foreign guardian can exercise, as such, no rights, or powers, or functions over the property, real or personal, of his ward, which is situated in a different state or country from that in which he has obtained his letters of guardianship. But he must obtain new letters of guardianship from the local tribunals, *authorized* to grant the same before he can exercise any rights, powers or functions over the same:" *Grimmett v. Witherington,* 16 Ark. 377.

Since, therefore, the court below had no authority to appoint a guardian for Mrs. McGuigan under the Act of 1909, upon the basis of the California proceedings, the appointment of Louis Day was beyond its powers. Similarly, its appointment of the substituted guardians, having no other basis, was made without jurisdiction and must also be vacated.

As the court below lacked jurisdiction to appoint guardians in this Commonwealth for Mrs. McGuigan, it is clear that she was not precluded by the prior decree from again attacking the appointment of the substituted guardians. Despite the averment by Mrs. Steiner in her

petition to vacate the appointment of Day that Mrs. McGuigan "is a citizen of the State of Pennsylvania and domiciled in and a resident of the City of New Kensington, County of Westmoreland, State of Pennsylvania", as to which there was no proof whatever, there is no record of any service upon appellant, or notice to her, of the petition and order, or of the introduction of any testimony to establish, even *ex parte,* the mental incapacity of the ward. There was, therefore, no jurisdictional fact determined in those proceedings, or in the subsequent proceedings to which Mrs. McGuigan was a party. As the lack of jurisdiction is apparent on the face of the record, the decree is properly subject to attack in these proceedings. See *Moskowitz's Registration Case,* 329 Pa. 183, 196 A. 498; *Clark Estate,* 275 Pa. 506, 119 A. 590; *Simpson's Estate,* 253 Pa. 217, 98 A. 35.

Although the appointments of Day and the substituted guardians were improper, and without effect as to the rights of Mrs. McGuigan, they were not nullities as to the guardians and their sureties. In *Foster v. Commonwealth,* 35 Pa. 148, where a register of wills had issued letters without authority, Chief Justice LOWRIE said (p. 150) : "Even if we should regard the letters as void, as affecting the estate, we should not regard them as void, as affecting the accountability of the persons acting under them. We should then treat the administrator as a usurper, and his sureties as aiding him in his acts, and then we would not allow them to set up the usurpation as a protection against accountability for it; for a man cannot take advantage of his own wrong, or set it up as a defence." (In that case the surety had raised the question also raised by the surety here in the court below, contending that, if the appointment of the fiduciary were void, the bond given was void also.) See *Doner's Estate,* 156 Pa. 301, 27 A. 42; *McConomy's Estate,* 170 Pa. 140, 32 A. 608; *Shalter and Ebling's App.,* 43 Pa. 83, and Annotation, 113 A. L. R. 412.

Both Day and the substituted guardians are, therefore, accountable to the court for such property of Mrs.

McGuigan in this Commonwealth as they received by virtue of their appointments. Day received a fund of money, in this Commonwealth, belonging to his California ward. His failure to account for this made him, properly, subject to the court's original order of surcharge and to its adjudication of contempt. Subsequently, he filed his report, in the nature of an account, setting forth all of his expenditures and the balance in his hands. *His ward, Mrs. McGuigan, filed a petition approving this account in its entirety and asking for its confirmation.* The report indicates that the account of Day as guardian of Mrs. McGuigan is now before the California court, and that distribution has not yet been made.

While the court below had the right to treat this report as an account, and to audit the same, it appears that in the audit it has again mistaken its powers. Louis Day was, so far as this record shows, the lawful guardian of Mrs. McGuigan in California, the state of her residence. Under color of his appointment here, he removed funds of his ward to California, where he received and administered them as guardian under the laws of that state. It does not appear that he committed any fraud on the court below in obtaining his appointment. His petition contains no misrepresentation of fact, and does not purport to comply with the Act of 1909 or any act of our legislature. His appointment was unlawful, but not fraudulent. He posted his bond here in the required amount, and, it is alleged, properly increased his bond in California when the fund was transferred into the custody of the courts of that State. He has accounted to the court having personal jurisdiction over his ward for these funds. The sum was transferred to California, invested, and used with the complete approval of Mrs. McGuigan, whom we recognize as having the exclusive ownership of the property, and the exclusive right to manage and control it. This right has also been recognized in the State of her residence, where she is now

restored to full competency. *The only parties who question the account are the substituted guardians, who are, themselves, mere usurpers.* These persons have no right, under the laws of this State or the laws of California to intermeddle further in the affairs of Mrs. McGuigan. If she, the sole owner of the estate, is satisfied with the stewardship of her guardian, what other person has the right to object?

Nevertheless, the court below has audited the account of the California guardian as if he were the guardian of a Pennsylvania resident. It has allowed him credit for moneys actually paid to Mrs. McGuigan for her support. As to all other items, it has taken the untenable position that, regardless of the purpose for which the money was spent, such expenditures were unauthorized and improper because his appointment in Pennsylvania (which was invalid in the first place), had been revoked before they were made. Mrs. McGuigan's approval is dismissed with the curious assertion that the court finds Day "is a designing person", without reference to proof, and that "there is no evidence before this court as to whether Mrs. McGuigan is mentally capable of understanding the nature of the petition she signed." When it is contemplated that there was never *any* evidence before the court to indicate that Mrs. McGuigan was mentally incapable to handle her own affairs, and that, by reason of the errors of the court below her rights have been made the object of a protracted litigation for more than two years, the unsoundness of the court's position is apparent.

The decree of the court below ordering a surcharge against Louis Day must be reversed. The Act of 1909, supra, makes no provision for the discharge of a guardian appointed for the property of a non-resident. It confers upon such guardian, as to the Pennsylvania estate of the ward, all of the powers of a guardian appointed for an incompetent resident. An accounting is directed only in the case of sale by the guardian of real

estate situated in this Commonwealth, for which confirmation must be obtained. The court below has assumed that the duties of such guardian and the courts to a non-resident incompetent are identical to those owed to a resident incompetent under the Act of 1907, as amended. It has therefore undertaken to follow the property of the non-resident out of this Commonwealth, to supervise the investment of the fund in the domicile of the non-resident, and to audit every item of expense incurred by the guardian in the administration of the estate. Obviously, this can result only in confusion.

The guardian whose appointment is contemplated by the Act of 1909 is not expressly designated as an ancillary guardian. Nevertheless, when the non-resident incompetent has a duly appointed guardian in the state of domicile, who also qualifies here, and when the property of the ward in Pennsylvania is *lawfully* removed to the domicile and placed in the custody of the domicilary court, it cannot be presumed that the power of *our* court should follow the fund and subject the *domiciliary guardian* to its supervision in the administration of the ward's estate. The domiciliary guardian is, properly, subject to the supervision of the domiciliary court. Confusion may be avoided if the purpose of the Act of 1909 is properly understood and carried out. The Act contemplates the appointment of a guardian in this Commonwealth to conserve and protect the property, real and personal, of a non-resident ward which is situated here. So long as such property remains within this jurisdiction, and in the hands of the Pennsylvania guardian, it is subject to the control of our courts. It is *in custodia legis*. The Pennsylvania guardian is merely the bailiff of the court which appointed him. See *Barclay-Westmoreland Trust Co. v. Dollar Savs. Bank,* 338 Pa. 421. As the Pennsylvania property of the ward is within the custody of the Pennsylvania court, and in the guardian's hands as its bailiff, the guardian cannot, without incurring personal liability, remove that property from

the jurisdiction without the approval of the court of Pennsylvania. Thus, it has been held that where an ancillary guardian *fraudulently, or without authority* from the court of ancillary jurisdiction, removes the property of the ward from that jurisdiction, he and his sureties remain liable therefor in the ancillary jurisdiction, even though the funds are actually transferred to the domiciliary guardian and accounted for by him or brought within the protection of his bond. See *American Surety Co. v. Quincey,* 125 Va. 1, 99 S. E. 641; *State ex rel. Lynch v. Whitehouse,* 80 Conn. 111, 67 A. 503; *Re Kincaid,* 6 P. (2d) 212 (Ore.); *Goodrich,* op. cit. supra. On the other hand, if the fund is *lawfully* transferred from the ancillary jurisdiction to the domiciliary guardian, with the approval of the ancillary guardian's court of appointment, no further accounting is required of the ancillary guardian, and thereafter the domiciliary guardian is solely accountable for the fund in the state of his appointment. See *Jefferson v. Glover,* 46 Miss. 510. While there is some conflict of authority on these points, the general principles stated are salutary, and apply by analogy in the administration of the Act of 1909.

It is true that in the present case Day did not obtain the approval of the court below to remove the Pennsylvania assets of his ward to California. It is also true, that he, as an officer of the court, did not obey the court's order to file an account, and is therefore in contempt. Had the ward been mentally incompetent, and had Day's right to remove the fund been predicated solely on his appointment here as guardian, the surcharge imposed by the court below would have been proper, despite the fact that he held the fund in California as a fiduciary, accountable to the court in that State and bonded there in an amount sufficient to cover it. The point overlooked by the court below is that Mrs. McGuigan, insofar as this record indicates, was, at the time of the removal of the property, the sole person who had the right of control over the fund. It was not *in custodia legis,* and the

court below had no power to interfere if she desired to remove the fund to California. This she could do as well by an agent, appointed by her or whose acts were subsequently adopted and ratified by her. In her petition she has averred that Day acted with her full approval in removing the fund, and that she has ratified all of his acts. Although adjudged incompetent because of *physical* infirmities in the State of her residence, she was, as to her property in this State, entirely competent. The removal of the fund by Day was not, therefore, unlawful nor fraudulent. While he should have sought leave to remove the assets, he has now accounted for the fund, has shown that it is in his hands as an officer of the California court with the approval of the only party in interest, and that she is there protected by an ample bond. His ward, now competent to manage her own affairs in California also, has asserted that no prejudice to her has resulted. Since the sole concern of this Court and the court below is the interest of Mrs. McGuigan in her own property, and since she does not complain of any of the expenditures of the guardian, there is no proper basis for surcharging him in any amount.

It must be understood that this Court does not condone the failure of Day to account to the court below and obey its orders. He was unquestionably guilty of contempt. Nor do we overlook the fact that the account which he filed in California has not yet, insofar as this record shows, been confirmed and the balance paid over to Mrs. McGuigan. Until that is done, and satisfactory evidence thereof is presented to the court below, final action upon his prayer to be purged of his contempt should be withheld.

The judgment against the surety, entered by the court below in these proceedings, must also be reversed. Regardless of the fact that the surcharge against its principal was improper, the surety was not a party to the proceedings, and the court below had no jurisdiction over it. It may be true, as the court below asserts, that

the surety actually directed the litigation on behalf of Day and Mrs. McGuigan, and that its counsel also acted as counsel for those parties. It is true that the surety filed a petition asking the court to receive Day's account and fix a time for audit, with notice to all parties in interest. It did not, however, intervene as a party to the proceedings, and no action was taken on its petition. The court did not fix a date for audit, but instead granted a rule upon the substituted guardians and Day to show cause why their appointments should not be vacated. Notice of the granting of the rule and of the return day was not given to the surety, and if it had been, would not have apprised the surety that *its* rights were to be determined. The court, however, in its opinion dismissing the rule, also passed upon the exceptions of the substituted guardians to the account of Day, audited the account, and entered judgment against the surety. Obviously the surety was not afforded the opportunity to be heard which due process requires. *National Automobile Corp. v. Barfod,* 289 Pa. 307, 137 A. 601. And see *Komara's Estates,* 311 Pa. 135, 166 A. 577; *Commonwealth v. Easton Trust Co.,* 347 Pa. 162.

In No. 60, March Term, 1944, the decree of the court below is reversed, and the appellees' appointment as guardian is vacated. As appellees received no property of the appellant, in their capacity as guardians, no accounting is ordered; this is without prejudice to the right of the appellant to compel Jennie L. Steiner, to account in any other action for any funds received by her as attorney-in-fact for appellant.

In No. 61, March Term, 1944, the judgment and decree is reversed, and the court below is directed to re-audit the account of Louis Day in conformity with the views herein expressed.

The costs on both appeals to be paid by appellees.