# In re Porter

*W. C. Ferguson, Jr.*, for petitioner.

*C. C. O'Brien*, for respondent.

*Richter, Lord & Farage*, for C. Nelson Davis.

FENERTY and ALESSANDRONI, JJ., February 20, 1948.—Mrs. Alice B. Porter, the wife of respondent,

Jesse Lukens Porter, filed this petition under the Act of May 28, 1907, P. L. 292, as amended, for the appointment of a guardian of the estate of her husband. Testimony has been presented on behalf of petitioner and respondent, giving the court the benefit not only of the findings of physicians and psychiatric specialists who have treated respondent, but also the opinions of experts upon hypothetical questions. In addition, the testimony of friends, relatives and business associates has aided materially in providing a rather complete, though pathetic, personal history.

The approach to and solution of the problem of mental illness such as we have before us are not unattended with difficulty. We are confined by legislation enacted at the beginning of the century, which we are called upon to interpret after several decades during which great though perhaps relatively superficial strides have been made by medical science. As a result the refinement in terminology alone impedes the path to a satisfactory conclusion.

Our judicial authority stems from the Act of May 28, 1907, P. L. 292, 50 PS §941, as amended, under the provisions of which the petition now before us was filed. Insofar as the present issues are concerned, the act substantially reënacted that of June 19, 1901, P. L. 574, which in turn amended the Act of June 25, 1895, P. L. 300.

Accordingly we find "whenever . . . any person . . . shall become insane or feeble-minded or epileptic, or so mentally defective that he . . . is unable to take care of his . . . property, and in consequence thereof is liable to dissipate or lose the same, and to become the victim of designing persons" it shall be lawful for enumerated classes of persons to petition the court of common pleas to adjudge such person unable to care for his property and to appoint a guardian of his estate.

It is apparent therefore that the burden is imposed on petitioner to prove at least that respondent is "so mentally defective that he is unable to take care of his property". That mental deficiency appears to be the minimum standard upon which a finding of the court can be based. The statute is so worded that we are not able to conceive a situation in which such mental deficiency exists without the resulting liability to dissipation of property or victimization by designing persons. The vital issue therefore is the existence of proof of the required mental deficiency. Succinctly, it is the mental condition that raises the presumption of liability to danger and not the liability of danger that raises the presumption of mental defectiveness: Leitch v. Leitch, 43 Pa. C. C. 134.

The degree of proof and the character of evidence required in proceedings under this act have been stated repeatedly by our appellate courts. Proof of mental incapacity must clearly meet the terms of the law before any person can be deprived of his right to manage his own property: Hoffman's Estate, 209 Pa. 357. Interference with this primary right of control can be justified only in a clear case: Colt's Case, 215 Pa. 333. So serious is this proceeding in juridical concept that the right can be taken away from a person only after preponderating proof of his lack of mental capacity to manage his own affairs: Denner v. Beyer, 352 Pa. 386, 397. The fundamental presumption of sanity and mental capacity cannot be lightly overthrown: McGuigan Estate, 349 Pa. 581, 589.

A true understanding of the strictness required is found in the danger sought to be avoided. Since the legal status or condition which permits the court to exercise its authority is a hybrid between normalcy and insanity, that is neither mens sana nor non compos mentis, it is apparent that the statute is a dangerous

one, easily capable of abuse by designing relatives *
to accomplish the very wrong intended to be guarded
against, and therefore must be administered by the
court with the utmost caution and conservativeness:
Hoffman's Estate, supra, at page 359; Bryden's Estate,
211 Pa. 633; In re Anna C. Brinton, 86 Pa. Superior
Ct. 194.

The narrow point to be decided is the mental condi-
tion of respondent at the time of the trial with respect
to his ability to take care of his property: Hyman's
Case, 139 Pa. Superior Ct. 212, 216; Gorgas v. Sax-
man, 216 Pa. 237. The evidence of respondent's recent
conduct is circumstantial and relevant to throw light
upon his present condition: 1 Wigmore on Evidence
(2nd ed.), 473 §228. His spoken words, his acts and
conduct are the best evidence of his mental capacity:
Hyman's Case, supra. We do not mean, however, to
relegate the testimony of the physicians or psychiatric
experts to a secondary position. Due consideration and
weight must be given not only to the testimony of their
experiences with this respondent but also to their opin-
ions. We might add that we carefully observed re-
spondent while in court, even though he did not testify.

A brief review of the evidence indicates conclusively
that the record does not meet the burden imposed upon
petitioner by the authorities. Respondent is 41 years
of age. He was married on January 3, 1929, and has
one child, a daughter, now 18 years of age. On Febru-
ary 12, 1947, he separated from his family, and there-
after on April 11, 1947, executed a separation agree-
ment as a result of negotiations between respective
counsel for himself and his wife, which provided for

---

* It should be noted at the outset that Mrs. Porter, in filing her
petition, acted with commendable diligence and dispatch, in protect-
ing her husband and his estate from falling into the hands of pos-
sible designing persons as the record will show and in particular
in the face of a general power of attorney executed by him to a
comparative stranger with power to do virtually as he pleased.

the support and maintenance of his wife and that of his daughter. It appears that respondent is the owner of property valued at approximately $500,000, the major portion of which was apparently inherited. At the age of 21 he turned over approximately $300,000 to the Fidelity-Philadelphia Trust Company, to be held by that institution for his benefit for a period of 10 years. That trust was never formally terminated and the settlor has continued it until the present time. During the 20 years of its existence he has withdrawn from principal approximately $27,000, of which $7,000 has been withdrawn during the year 1947. Through capital accretions the net amount of the trust has not diminished. On November 13, 1942, he deposited approximately $75,000 with the Provident Trust Company in an agency account, which is still operating and which discloses a capital value of approximately $103,000 at the present time. The balance of his wealth is a 60 percent interest in a partnership which has been operating for several years and which appears to be a successor to a family business which was the source of most of his means.

Petitioner and other lay witnesses testified in order to establish specific incidents indicating a personality change and thereby provide a basis for expert testimony. We will not attempt to repeat the testimony in detail but for obvious reasons choose to confine this opinion to a general summary. There is no denial that respondent for many years has been addicted to the excessive use of alcohol. His wife stated that he had often told her that he began when he was but 14 years of age. The fall of 1944, however, is selected as the time when the alleged personality changes appeared. His interests in sports and athletics waned, and although he had always dressed fastidiously, he became careless not only in his dress but in his personal cleanliness. His parental interest in his daughter and her associates was replaced by indifference and per-

haps by behavior at times so offensive as to be utterly indefensible. Normally a social person, he lost interest in friends and guests at his home; he became careless about the handling of firearms; he lost his phobia about fire, and finally, his repeated efforts to abstain from the excessive use of alcoholic liquors became hopelessly futile.

Incidents relating to periods of hallucination during some of which respondent was violent and irrational are explained in a manner beneficial to respondent by the medical witnesses offered by petitioner. Doctor James Schell, who is also a friend of respondent, testified that in January of 1945, when respondent was hospitalized, he was suffering from pneumonia as well as alcoholism and that the hallucinations ended with the abatement of his exceedingly high fever. He likewise testified that on the occasions later in the year when he attempted to persuade respondent to consult a psychiatrist, he did so because of his alcoholism and not for any suspected mental or functional disease. Again it appears from the testimony of this witness that a subsequent hospitalization in June of 1946 was induced by a respiratory infection. Doctor Gilpin's testimony also establishes that respondent was unable to control his addiction to alcohol when he treated him during 1946. Doctor Drayer, who treated him frequently during that year, testified that he was suffering from acute alcoholism. Doctor Hanno, who saw respondent on but one occasion in August of 1947 and who was not a neuropsychiatrist, stated that he had no knowledge of any neurological examination and found no abnormality. Doctor Gopadze, who treated respondent repeatedly during 1947, testified that he was suffering from alcoholism, and at the time of his examination on September 8, 1947, he found him physically rather weak but mentally "I would say he was in pretty good health". As late as November 16, 1947, the witness said that respondent realized his state as an alcoholic

and was determined to make a sincere effort to effect a cure, although he was firm in his refusal to be institutionalized. Doctor C. Nelson Davis, a neuropsychiatrist, had respondent under his care when he was admitted to the alcoholic ward of the St. Luke's and Children's Hospital. He likewise found from his contacts with this patient that his periods of hallucination could be determined by an examination of his temperature chart. Doctor Yaskin, an eminent specialist, examined respondent in August of 1947 and testified that a physical and neurological examination was negative. He diagnosed the illness as chronic alcoholism complicated by convulsions. In reply to a hypothetical question Doctor Yaskin refused to identify specifically the mental state of respondent at the time of hearing. Cautiously he stated that from time to time respondent became totally incapable of taking care of his property and also his person, but refused to go further than stating that "there is something going on in his nervous system so that the taking of alcohol brings about a major physical and mental disturbance. . . . This man has great changes in his mental condition and he has had such mental disturbances that he might become the victim of designing persons". Doctor Leavitt, in replying to a hypothetical question, testified that there was progressive mental deterioration induced by excessive use of alcohol, producing a change in personal behavior to such a degree that he is apt to become the victim of designing persons. Finally, Doctor Drayer, an equally eminent specialist, testified that this unfortunate individual had reached a stage in the consumption of alcohol where his judgment is frequently impaired to a point where he would be the victim of designing persons, but he added that at the precise moment he could not say that respondent's judgment might not be good.

It will be seen that the testimony of these witnesses on behalf of petitioner leaves much to be desired in the

light of the burden of proof. No one denies that we have before us an alcoholic but it is clear that no one has stated unequivocally that this man at the time of trial is so mentally defective that he cannot manage his property.

On the other hand, equally eminent neuropsychiatrists stated that respondent's mental condition at the present time is normal. Dr. George Wilson, who examined respondent on four occasions since December 18, 1947, stated that there was no sign of mental impairment or deterioration. Doctor Davis, under whose care respondent has been since December 8, 1947, testified that up until this time there has been no permanent damage to the nervous tissue from the excessive use of alcohol. Both of these experts from personal examination unequivocally state that respondent possesses the mental equipment to care for his property in a proper fashion.

It will be seen therefore that the basic contention is acute alcoholism with incidental psychosis. The experts contradict one another and those who testified on behalf of petitioner, while convinced of respondent's incompetence, admit that he does have and will have lucid intervals.

We are doubtful of the authority of the court of common pleas to appoint a guardian for an inebriate under this statute, and its applicability to habitual drunkards is questionable: Gorgas v. Saxman, supra, and In re Lukesh, 32 Luz. 23, 52 York 60. We believe that the evidence is not sufficiently clear and preponderating to support a finding of more than habitual drunkenness. We do not think that the legislature by the Act of 1907 intended to protect drunkards from their own improvidence, nor can we be convinced that the legislature at that time recognized habitual drunkenness as a form of mental illness, and more specifically intended that it be considered as a condition of mental defectiveness as defined in that act.

This is particularly clear from the continued existence of the Act of June 13, 1836, P. L. 589, which provided for the issuance of a commission to inquire into the habitual drunkenness of any person within this Commonwealth.

The only indication of unusual behavior by respondent in the management of his estate was the execution and delivery of a power of attorney, dated November 6, 1947, appointing a member of the bar as his attorney in fact. In view of the fact that he had consulted his personal counsel but a short time before and had been accustomed throughout his life to consult the same counsel who had represented his family for generations, the apprehension of petitioner is patent. In contrast to that unusual trust in a relative stranger was his voluntary commitment to an institution at the instance of his newly appointed attorney in fact where he is presently residing and receiving treatment as an alcoholic. The possible danger flowing from this act has been obviated at least for the time being by the cancellation of that power.

The specific incidents offered to establish personality change and mental deficiency are so inextricably interwoven with periods of intoxication that it cannot be said with conviction that mental deterioration sufficient to meet the requirements of the act has been established. Clearly, we have no authority to impose restraints upon all who indulge in Bacchanalian revelry no matter how it may prejudice their material wealth, any more than we can prevent a man from giving away his estate to the prejudice of his wife and children. We cannot protect respondent from the consequences of his acts committed during periods of intoxication. The mere fact that he might commit an imprudent or foolish act and thereby dissipate a material part or all of his fortune during a drunken orgy is a potential danger, the existence of which, nevertheless, is not a sufficient basis for granting the prayer of

this petition. We do not intend to pass upon the rights of petitioner to proceed under the Act of 1836, which is a matter not now before us. We are convinced, however, that the proofs required and the character of the evidence demanded under the Act of 1907 are not present in this case. We are unable to conclude that respondent is "so mentally defective" that he is unable to take care of his own property.

### Order

And now, to wit, February 20, 1948, the petition is dismissed.